PEOPLE v BROWN

Docket No. 271164. Submitted November 16, 2007, at Detroit. Decided May 22, 2008, at 9:00 a.m.

Craig G. Brown was convicted by a jury in the Oakland Circuit Court of delivering and manufacturing a controlled substance classified in schedule 1, 2, or 3, MCL 333.7401(2)(b)(*ii*), and possession of a controlled substance classified in schedule 1, 2, or 3, MCL 333.7403(2)(b)(*ii*). The court, John J. McDonald, J., sentenced the defendant to one year of probation, with the first 90 days to be served in jail, and ordered him to pay $4,200 in costs. The defendant appealed, alleging, in part, that Mich Admin Code, R 338.3122(2), which states that an anabolic steroid that is expressly intended for administration through implants to cattle or other nonhuman species and which has been approved by the United States Drug Enforcement Administration for such administration is specifically excepted from schedule 3, is unconstitutionally vague because a person of ordinary intelligence cannot read the rule and conclude that it can be illegal to possess in a form intended for nonhuman consumption an anabolic steroid listed in schedule 3.

The Court of Appeals *held*:

1. Rule 338.3122(2) focuses on the possessor's intent, not on the physical form of the anabolic steroid at the time it is possessed. While possession of an anabolic steroid that is intended for administration through implants to cattle is not illegal, possession of an anabolic steroid intended for human consumption is illegal. The overwhelming circumstantial evidence indicates that the defendant had not intended to use the anabolic steroids on cattle or some other nonhuman species but had intended its use for human consumption. The anabolic steroids involved in this case were a controlled substance.

2. Collateral estoppel bars the relitigation of the issues raised by the defendant regarding all but one of the search warrants involved in this matter because the validity of those warrants was upheld in an appeal from a conviction in a different circuit court that arose from some of the defendant's conduct in the instant case. A reasonably cautious person could have concluded, given the

defendant's knowledge of steroids, use of steroids, and likely possession of steroids, that there was a substantial basis for a finding of probable cause that anabolic steroids would be found in the defendant's urine to support the issuance of the search warrant for a urine sample from the defendant.

3. No Fourth Amendment violation occurred when the police, using EnCase forensic software, searched the password-protected files of the defendant that were contained on a computer owned by his landlord, who had allowed the defendant to use the computer and who gave the police her consent to search the computer.

4. The defendant's claims of prosecutorial misconduct are without merit.

5. The trial court properly denied the defendant's motion for a directed verdict.

6. The trial court did not err in imposing costs on the defendant under MCR 771.3 to reimburse the prosecution's expenses with respect to an expert witness at trial.

7. None of the defendant's claims of ineffective assistance of counsel has merit.

8. Although there may be some merit to the defendant's argument that statements that he made during an interview procured under the threat of discharge from his employment as a police officer were improperly used to secure a search warrant for his medical records, the defendant failed to show that the statements or information derived from the statements were used against him.

9. Contrary to the defendant's claim, the trial court did state its reasons for denying the defendant's motion for mistrial.

Affirmed.

WHITE, J., concurring in part and dissenting in part, disagreed with the conclusion that Rule 338.3122(2) plainly and unambiguously provides that the possession of an anabolic steroid in a form that is expressly intended for administration through implants to cattle or other nonhuman species and which has been approved by the United States Drug Enforcement Administration for such administration is illegal if the possessor intends the anabolic steroid for human consumption. The word "intended" is directed at the use for which the drug is expressly made and approved, and not the use intended by the possessor.

CONTROLLED SUBSTANCES — ANABOLIC STEROIDS.

The Board of Pharmacy rule that identifies the anabolic steroids that are prohibited schedule 3 controlled substances and that

exempts from schedule 3 an anabolic steroid that is expressly intended for administration through implants to cattle or other nonhuman species and that has been approved by the United States Drug Enforcement Administration for such administration is not unconstitutionally vague; the rule gives adequate notice that the possession of an anabolic steroid listed in schedule 3 with the intent that it be consumed by a human is illegal while the possession of an anabolic steroid listed in schedule 3 with the intent that it be administered through implants to cattle is not illegal; the legality of such possession is not determined by the physical form of the anabolic steroid at the time it is possessed but by the possessor's intent regarding its use (Mich Admin Code, R 338.3122).

*Michael A. Cox*, Attorney General, *Thomas L. Casey*, Solicitor General, *David G. Gorcyca*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *Thomas R. Grden*, Assistant Prosecuting Attorney, for the people.

*Robert J. Dunn* and Craig G. Brown *in propria persona*.

Before: ZAHRA, P.J., and WHITE and O'CONNELL, JJ.

ZAHRA, P.J. Defendant appeals as of right his jury trial conviction in the Oakland Circuit Court of violating MCL 333.7401(2)(b)(*ii*) (delivery and manufacture of a controlled substance classified in schedule 1, 2, or 3) and MCL 333.7403(2)(b)(*ii*) (possession of a controlled substance classified in schedule 1, 2, or 3).[1] The trial

---

[1] Some of defendant's alleged conduct in the instant case led to a previous jury trial conviction in the Lapeer Circuit Court. There, a jury convicted defendant of willful neglect of duty, MCL 750.478, but acquitted him of three counts of delivery of a controlled substance, MCL 333.7401(2)(b). He was sentenced to 180 days in jail. This Court affirmed, *People v Brown*, unpublished opinion per curiam of the Court of Appeals, issued April 7, 2005 (Docket No. 254476), and on May 31, 2005, our Supreme Court denied defendant's application for leave to appeal. *People v Brown*, 472 Mich 922 (2005).

court sentenced him to one year of probation, the first 90 days to be served in jail, and $4,200 in costs. The most significant issue presented on appeal is whether Mich Admin Code, R 338.3122(2) is unconstitutionally vague. We hold it is not. Rule 338.3122(2) focuses on the possessor's intent. Possession of an anabolic steroid that is "intended for administration through implants to cattle" is not illegal. *Id.* Conversely, possession of an anabolic steroid intended for human consumption is illegal. We affirm.

### I. BASIC FACTS AND PROCEEDINGS

Defendant was a police officer with the Almont Police Department and the Brown City Police Department. Lieutenant Timothy Donnellon of the St. Clair County Sheriff's Department testified that in February 2003, he was investigating Brown City Police Officer Albert Geoit for anabolic-steroid use. Donnellon testified that the Geoit investigation led him to investigate defendant. The search warrants issued in this case indicate that Geoit told the police that defendant supplied him anabolic steroids.

Donnellon asked Michael Winters, an inspector with the Postal Inspection Service, to intercept any suspicious parcels addressed to P.O. Box 364, Lakeville, Michigan, which is within Oakland County. The post office box was registered to defendant, and only defendant had access to the post office box. On February 28, 2003, a parcel arrived for defendant's post office box. Winters requested a federal search warrant to inspect the parcel. After obtaining the warrant, Winters executed the search himself. The parcel contained 10 packages of Finaplix-H, which the Michigan State Police laboratory confirmed contained Trenbolone. The package did not contain an applicator for animal injec-

tion. At trial, Winters admitted that defendant did not arrive to pick up the parcel. Winters also admitted that he had previously testified that, in regard to Trenbolone, "[i]f it's for veterinary use, its legal."

On March 1, 2003, Donnellon executed a warrant to search defendant's residence. The owner of the building, Gladys Graves, lived on the second story and defendant rented the first floor. The police found evidence linking defendant to the first floor, including a filled-out employment application and credit cards. In the only first-floor bedroom that appeared to be lived in, the police found a magazine, "Anabolics 2000," laying on the bed. In the first-floor kitchen, the police found a topical anabolic steroid, Testosterone Androgel, which is available by prescription. The police discovered additional anabolic-steroid-related magazines. The police also found defendant's credit-card statements reflecting purchases from Websa Co., the source of the Finaplix-H in the parcel, and Finafarm, a company that sells a kit that makes possible the human consumption of anabolic steroids (kit). Lapeer County Sheriff Detective Nancy Stimson recovered such a kit in a garbage bag from defendant's house. Donnellon ordered a kit from Finafarm, and Stimson testified regarding the similarities between the kit found at defendant's residence and the kit ordered by Donnellon. Donnellon also testified that the kit he received was very similar to the kit found in defendant's residence.

At trial, Stimson also testified that Graves had a computer upstairs that Graves allowed the police to search. Stimson brought the computer to Robert Gottschalk, an expert in electronic-data retrieval, for investigation. Gottschalk removed the hard drive and used EnCase forensic software to make a copy of the hard drive. Gottschalk testified that EnCase software

allows reproduction of all files that have not been overwritten, including Internet files. In particular, he testified that

> it created — it created the image, which is a — refer to as a mirror image, is an exact copy of everything that's on the hard drive; not only the data but everything else that's there. Maybe a file that was deleted at one time. It copies all of the data off of it.

Gottschalk searched the copied hard drive for anabolic-steroid-related terms, and found numerous e-mails relating to defendant's purchases of anabolic steroids.

Donnellon also obtained a warrant to search defendant's urine for anabolic steroids. Defendant refused to provide a urine sample several times, but he eventually did so. The sample was sent to American Institute of Toxicology (AIT). Defendant's urine sample first was tested generally for steroids, but not specifically for Trenbolone. The test was negative, but Michael Evans, founder and director of AIT, later retested defendant's urine specifically for Trenbolone, and it was positive.

Evans, an expert in toxicology, testified that Trenbolone is used in veterinary practices to increase muscle mass in cattle. A special syringe injects a pencil-like Trenbolone pellet into cattle to be slowly released. He testified that Trenbolone can be extracted from the pellets with a kit; specifically, a conversion kit like that received by Donnellon, which is similar to the one found at defendant's residence. Evans testified that each Finaplix-H package in defendant's post office box contained 20,000 milligrams of Trenbolone, which is between 200 and 400 dosages. He testified that this amount is more than one human would require. Evans testified that Trenbolone is inappropriate for use in smaller animals, such as cats and dogs.

Michael Henry, defendant's friend, testified for the defense. Henry testified that he asked defendant to order Finaplix-H for Henry's dog. The jury convicted defendant, and he appeals as of right.

## II. CONSTITUTIONALITY OF MICH ADMIN CODE, R 338.3122(2)

Defendant argues that Michigan Board of Pharmacy Rule 338.3122(2) is unconstitutional.

MCL 333.7401(1), provides:

> Except as authorized by this article, a person shall not manufacture, create, deliver, or possess with intent to manufacture, create, or deliver a controlled substance, a prescription form, or a counterfeit prescription form. A practitioner licensed by the administrator under this article shall not dispense, prescribe, or administer a controlled substance for other than legitimate and professionally recognized therapeutic or scientific purposes or outside the scope of practice of the practitioner, licensee, or applicant.

MCL 333.7401(2)(b)(*ii*) further provides that "[a] person who violates this section as to[,] [a]ny other controlled substance classified in schedule 1, 2, or 3, except marihuana[,] is guilty of a felony punishable by imprisonment for not more than 7 years or a fine of not more than $10,000.00, or both.

Similarly, MCL 333.7403(1), provides that

> [a] person shall not knowingly or intentionally possess a controlled substance, a controlled substance analogue, or a prescription form unless the controlled substance, controlled substance analogue, or prescription form was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of the practitioner's professional practice, or except as otherwise authorized by this article.

MCL 333.7403(2)(b)(*ii*) further provides that "[a] person who violates this section as to"

[a] controlled substance classified in schedule 1, 2, 3, or 4, except a controlled substance for which a penalty is prescribed in subdivision (a), (b)(i), (c), or (d), or a controlled substance analogue is guilty of a felony punishable by imprisonment for not more than 2 years or a fine of not more than $2,000.00, or both.

Here, the central question is whether Trenbolone, a drug contained in the Finaplix-H, is a controlled substance classified in schedule 1, 2, or 3. Rule 338.3122(1), entitled, "Schedule 3; anabolic steroids; exemptions," states that,

[u]nless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation that contains any quantity of an anabolic steroid, including its salts, isomers, and salts of isomers if the existence of such salts of isomers is possible within the specific chemical designation, is included in schedule 3. As used in this rule, the term "anabolic steroid" means any of the following drugs or hormonal substances which are chemically and pharmacologically related to testosterone, other than estrogens, progestins, and corticosteroids, and which promote muscle growth[.]

Rule 338.3122(1)(w) then expressly identifies "Trenbolone."

Rule 338.3122(2) provides that "[a]n anabolic steroid which is expressly intended for administration through implants to cattle or other nonhuman species and which has been approved by the United States drug enforcement administration for such administration is specifically excepted from schedule 3." Trenbolone is an anabolic steroid that has been approved by the United States Secretary of Health and Human Services for administration through implants to cattle or other nonhuman species. 21 CFR 1308.

Defendant argues that Rule 338.3122 is unconstitutionally void for vagueness because it fails to provide

fair notice of prohibited conduct. Specifically, defendant claims that because the Michigan Board of Pharmacy exempted Trenbolone in Rule 338.3122(2), the possession or intent to deliver it became lawful.

" 'To determine whether a statute is void for vagueness, a court examines the entire text of the statute and gives the statute's words their ordinary meanings.' " *People v Pierce*, 272 Mich App 394, 398; 725 NW2d 691 (2006), quoting *People v Piper*, 223 Mich App 642, 646; 567 NW2d 483 (1997). A statute is unconstitutionally vague if persons of ordinary intelligence must necessarily guess at its meaning. *Pierce, supra* at 398-399, citing *People v Munn*, 198 Mich App 726, 727; 499 NW2d 459 (1993).

Here, the plain and unambiguous language of Rule 338.3122(1)(w) expressly identifies "Trenbolone" as a prohibited schedule 3 controlled substance. Rule 338.3122(2) exempts "Trenbolone" as a schedule 3 controlled substance only if "expressly intended for administration through implants to cattle or other nonhuman species . . . ." There is no guesswork in applying Rule 338.3122 because it plainly and unambiguously identifies Trenbolone as a controlled substance. Trenbolone is excluded from being a controlled substance only if it is expressly intended to be used or administered "through implants to cattle or other nonhuman species . . . ." Thus, defendant's argument that Rule 338.3122 is facially unconstitutional for vagueness is without merit.

The dissent concludes that Rule 338.3122(2) is void for vagueness, reasoning that a person of ordinary intelligence cannot read the pertinent statutory and regulatory provisions and conclude that when Trenbolone is in a form not intended for human consumption, its possession can be illegal. The dissent, in our

view, erroneously focuses on the physical form of the drug, not the possessor's intent when possessing the drug. We do not conclude that such a reading of the regulation is reasonable. None of the pertinent statutory or regulatory provisions supports the conclusion that the legality of possessing Trenbolone turns on its physical form at the time it is possessed. Rather, Rule 338.3122(2) focuses on the possessor's intent. Possession of an anabolic steroid that is "intended for administration through implants to cattle" is not illegal. *Id.* Conversely, possession of an anabolic steroid intended for human consumption is illegal.[2]

Moreover, Rule 338.3122 is not void for vagueness as applied to this case. The trial court here specifically instructed the jury that "the substance at issue in this case is Trenbolone, which is a controlled substance unless it is 'expressly intended for administration through implant[s] to cattle or other non-human species.' " These instructions accord with Rule 338.3122, and, therefore, defendant's challenge must be rejected.

### III. SEARCH WARRANTS

Defendant next claims that he was subjected to six search warrants in violation of the Fourth Amendment of the United States Constitution and Const 1963, art 1, § 11. The six search warrants provided access to (1) a urine sample, (2) defendant's medical records, (3) defendant's post office box, (4) defendant's residence, (5) records from Websa Co., and (6) records from Finafarm.

---

[2] The prosecution must establish the possessor's intent, regardless of the physical form of the drug. Here, the overwhelming circumstantial evidence in this case is that defendant was not using Trenbolone on cattle or some other nonhuman species. Rather, the evidence supports the conclusion that defendant was ordering Finaplix-H to extract Trenbolone for human consumption.

Here, several courts have already reviewed all but the search warrant for defendant's urine, which was not raised in the previous appeal. In the instant case, the trial court concluded that collateral estoppel prevented defendant from further challenging the validity of the remaining search warrants. We agree with the trial court.

In *People v Brown*, unpublished opinion per curiam of the Court of Appeals, issued April 7, 2005 (Docket No. 254476), this Court expressly rejected defendant's claims that the instant search warrants, except the one for defendant's urine sample, were invalid. Our Supreme Court subsequently denied defendant's application for leave to appeal. *People v Brown*, 472 Mich 922, (2005).

The doctrine of collateral estoppel applies to criminal cases. *Ashe v Swenson*, 397 US 436, 443; 90 S Ct 1189; 25 L Ed 2d 469 (1970). Collateral estoppel bars relitigation of an issue in a subsequent, different litigation between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was both actually litigated and necessarily determined. *People v Gates*, 434 Mich 146, 154; 452 NW2d 627 (1990). Collateral estoppel only applies if the issue was necessarily determined by the judgment in the prior proceeding. *Id.* at 158. "An issue is necessarily determined only if it is 'essential' to the judgment." *Id.* "Collateral estoppel applies only where the basis of the prior judgment can be ascertained clearly, definitely, and unequivocally." *Id.*

Here, there is no dispute that the validity of the instant search warrants, except the warrant for the urine sample, were previously litigated and necessarily determined. Further, defendant was afforded the opportunity and indeed participated in litigating the search

warrants in the Ingham Circuit Court. In addition, Supreme Court precedent indicates that the Ingham County Prosecutor and the Oakland County Prosecutor are the same party for purposes of collateral estoppel, because they are functionally equivalent and "creatures of the state[,] and thus should be considered to be the same party." See *Gates, supra* at 156.

Defendant also claims that the search of his urine was unconstitutional because the warrant was stale and contained inadequate facts, i.e., "bare bones." " 'A search warrant should be upheld if a substantial basis exists to conclude that there is a fair probability that the items sought will be found in the stated place.' " *People v Whitfield*, 461 Mich 441, 444; 607 NW2d 61 (2000), quoting *People v Whitfield*, unpublished memorandum opinion of the Court of Appeals, issued September 25, 1998 (Docket No. 207229). " 'The reviewing court should ask whether a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause.' " *Id.* " 'The underlying affidavit must be read in a common sense and realistic manner . . . .' " *Id.* In reviewing a decision to suppress, this Court reviews the trial court's findings of fact for clear error and will uphold those findings unless left with a definite and firm conviction that a mistake was made. *People v Taylor*, 253 Mich App 399, 403; 655 NW2d 291 (2002). This Court reviews de novo the trial court's ultimate ruling on the defendant's motion to suppress. *Id.*

Generally, if evidence is unconstitutionally seized, it must be excluded from trial. Exclusion of improperly obtained evidence serves as a deterrent to police misconduct, protects the right to privacy, and preserves judicial integrity. *Terry v Ohio*, 392 US 1, 12-13; 88 S Ct 1868; 20 L Ed 2d 889 (1968). "It is settled law that

probable cause to search must exist at the time the search warrant is issued and that probable cause exists when a person of reasonable caution would be justified in concluding that evidence of criminal conduct is in the stated place to be searched." *People v Russo*, 439 Mich 584, 606-607; 487 NW2d 698 (1992) (citations omitted). The passage of time is a valid consideration in deciding whether probable cause exists. The measure of the staleness of information in support of a search warrant rests on the totality of the circumstances, including the criminal, the thing to be seized, the place to be searched, and the character of the crime. *Id.* at 605-606; *People v Sobczak-Obetts*, 253 Mich App 97, 108; 654 NW2d 337 (2002).

Defendant claims that there is no evidence that he had recently used Trenbolone. The affiant averred that on February 19, 2003, Donnellon indicated that Geoit admitted purchasing steroids on three occasions from defendant. Donnellon informed the affiant that defendant instructed Geoit on how to administer anabolic steroids. Further, Donnellon indicated to the affiant that Geoit's home had been searched and that anabolic steroids were found. The affiant also averred that Almont Police Chief Eugene Bruns indicated that he had known defendant for three years, and that during the first year defendant injected himself with insulin to treat diabetes. However, Bruns indicated that defendant later required an internally installed insulin pump to regulate his blood sugar, and that defendant had increased his muscle bulk and experienced mood swings. The affiant learned from Dr. Russell Bush that anabolic-steroid use by a diabetic causes unstable blood sugar and could cause the need for an insulin pump. The affiant averred that she had obtained information indicating that steroids remain in the human body two weeks after use. The affiant last averred that, in her 28

years of police experience, she has observed that drug traffickers also tend to use the drugs that they sell.

Here, a substantial basis existed to conclude that there was a fair probability that anabolic steroids would be found in defendant's urine. Defendant's knowledge of steroids, his sale of steroids, and his promotion of steroid use provided a substantial basis to conclude that defendant was involved with steroids. Defendant's increased muscle mass and mood swings, along with his need of an insulin regulator, which could be related to steroid use, supported the conclusion that defendant had been using steroids for some time. That the police discovered steroids in Geoit's home indicates that defendant may have also had possession of steroids. Given defendant's knowledge of steroids, use of steroids, and likely possession of steroids, a reasonably cautious person could have concluded that there was a substantial basis for the finding of probable cause.

Moreover, reversal is not required because defendant has failed to show how evidence of his positive urine test affected the outcome of the trial. Consistent with the trial court's jury instruction, the prosecution used the evidence for the limited purpose of challenging defendant's assertion that he purchased the steroids for Henry to give to his dog. However, the prosecution presented evidence that defendant purchased the steroids for personal use. Specifically, the prosecution presented evidence of used steroid kits found in defendant's garbage, numerous e-mails suggesting his steroid use, his statement upon arrest that Finaplix-H was legal, and his sale of steroids to Geoit. Taken independently or in combination, this evidence provides overwhelming evidence that defendant did not purchase Trenbolone for Henry to give to his dog. Thus, assuming that defendant's positive steroid test result was

improperly admitted at trial to impeach Henry, reversal is nonetheless not required because overwhelming evidence was presented to put Henry's credibility in question.

## IV. SEARCH OF COMPUTER

Defendant argues that the police violated his Fourth Amendment rights by searching his password-protected e-mail files with the consent of the computer's owner, who had allowed defendant to use the computer.

US Const, Am IV, and Const 1963, art 1, § 11, guarantee the right of the people to be free from unreasonable searches and seizures. *People v Borchard-Ruhland*, 460 Mich 278, 293-294; 597 NW2d 1 (1999). However, this right is personal and may not be invoked by third parties. *People v Zahn*, 234 Mich App 438, 446; 594 NW2d 120 (1999). For an individual to assert standing to challenge a search, the individual must have had a legitimate expectation of privacy in the place or location searched, which expectation society recognizes as reasonable. *People v Powell*, 235 Mich App 557, 560; 599 NW2d 499 (1999). The defendant has the burden of establishing standing, *People v Lombardo*, 216 Mich App 500, 505; 549 NW2d 596 (1996), and in deciding the issue, the court should consider the totality of the circumstances. *People v Smith*, 420 Mich 1, 28; 360 NW2d 841 (1984). " 'Factors relevant to the determination of standing include ownership, possession and/or control of the area searched or item seized; historical use of the property or item; ability to regulate access; the totality of the circumstances surrounding the search; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of the expectation of privacy considering the specific facts of the case.' " *Powell, supra* at 563 (citations omitted).

Here, the record reflects that defendant did not own the computer or the residence in which it was located. Although he was allowed access to the computer, there is no evidence that he had a right to use the computer and there is no evidence that he could regulate others' access to the computer. Indeed, Graves's children and grandchildren used the computer.

Further, even if defendant had standing to challenge the police's search of the computer, there is no Fourth Amendment violation because Graves expressly consented to the search.

> Searches and seizures conducted without a warrant are unreasonable per se, subject to several specifically established and well-delineated exceptions. *Schneckloth v Bustamonte*, 412 US 218; 93 S Ct 2041; 36 L Ed 2d 854 (1973); *People v Champion*, 452 Mich 92; 549 NW2d 849 (1996).

> One established exception to the general warrant and probable cause requirements is a search conducted pursuant to consent. *Schneckloth, supra* at 219. [*Borchard-Ruhland, supra* at 293-294.]

Generally, that consent must come from the person whose property is being searched or from a third party who possesses common authority over the property. *Illinois v Rodriguez*, 497 US 177, 181; 110 S Ct 2793; 111 L Ed 2d 148 (1990). "Common authority" is based "on mutual use of the property by persons generally having joint access or control for most purposes . . . ." *United States v Matlock*, 415 US 164, 171 n 7; 94 S Ct 988; 39 L Ed 2d 242 (1974). Further, a third party without actual authority to consent to a search may render a search valid if the police officer's belief in the authority to consent was objectively reasonable. *Rodriguez, supra*; *People v LaBelle*, 273 Mich App 214, 221-222; 729 NW2d 525 (2006). However, the consent of a third party does not render a search valid if the other

party is present and expressly objects to the search. *Georgia v Randolph*, 547 US 103, 106; 126 S Ct 1515; 164 L Ed 2d 208 (2006); *People v Lapworth*, 273 Mich App 424, 427; 730 NW2d 258 (2006). Although a police officer may not remove someone from the premises for the purpose of preventing an objection, the officer is not required to locate an absent person to obtain the person's consent. *Id.* at 427-428.

Here, there is no dispute that the computer was located in Graves's separate residence. In his brief on appeal and Standard 4 brief, Administrative Order No. 2004-6, Standard 4, defendant indicates that he was handcuffed in his residence when Graves consented to the search of the computer. Thus, defendant was not present in Graves's residence to object, and Graves's consent therefore remains valid.

Defendant also argues[3] that Graves's consent was invalid because his e-mail account was protected by a password. He specifically argues that "even though the files were allegedly accessed using the computer of Ms. Graves the police had no right to enter those password protected files without a search warrant." In making this argument, defendant claims the prosecution misled the trial court by representing that "anyone, anyone can use — open up that computer and found [sic] the information." Defendant concludes that "[t]his ruling could only have been based on the false information that anyone could log onto the computer and view the Defendants e-mail password protected files."

Police Officer Robert Gottschalk, an expert in the field of retrieving electronic data, testified that after he received the computer, he removed the hard drive, and used EnCase forensic software to make a copy of the

---

[3] Defendant first raised this argument after his conviction.

hard drive. He testified that EnCase software allows reproduction of all files that have not been overwritten, including Internet files. In particular, he testified that

> it created — it created the image, which is a — refer to as a mirror image, is an exact copy of everything that's on the hard drive; not only the data but everything else that's there. Maybe a file that was deleted at one time. It copies all of the data off of it.

He testified that he searched the copied hard drive for steroid-related terms and found several documents, including e-mails that reference the purchase of steroids.

Few cases have discussed the propriety of EnCase software. In *United States v Andrus*, 483 F3d 711 (CA 10, 2007), the defendant's father consented to the search of a computer in the defendant's bedroom. *Id.* at 713. The police used EnCase software to directly access the hard drive without first determining the need for a user name or password. *Id.* at 713-714. There was testimony that someone without forensic equipment would need the defendant's user name and password to access files stored within the defendant's user profile. *Id.* at 714 n 1.

The court indicated that "[t]he critical issue in our analysis is whether, under the totality of the circumstances known to [the police], these officers could reasonably have believed [the defendant's father] had authority to consent to a search of the computer. Phrased in the negative, we must ask 'whether the surrounding circumstances could conceivably be such that a reasonable person would doubt [the defendant's father's consent] and not act upon it without further inquiry.'" *Id.* at 720 (citations omitted). The court then noted that, "[i]f the circumstances reasonably indicated [the defendant's father] had mutual use of or control

over the computer, the officers were under no obligation to ask clarifying questions." *Id.* Here, there is no dispute that Graves had control, if not exclusive control, over the computer. Accordingly, the officers were under no obligation to ask whether defendant's files were protected by a password. Thus, defendant's claim that his Fourth Amendment rights were violated must be rejected.

### V. PROSECUTORIAL MISCONDUCT

Generally, a claim of prosecutorial misconduct is a constitutional issue that is reviewed de novo, but a trial court's factual findings are reviewed for clear error. *People v Abraham,* 256 Mich App 265, 272; 662 NW2d 836 (2003). Here, however, there was no contemporaneous objection or request for a curative instruction in regard to any alleged error, and thus review is limited to ascertaining whether plain error affected defendant's substantial rights. *People v Callon,* 256 Mich App 312, 329; 662 NW2d 501 (2003).

The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial. *People v Dobek,* 274 Mich App 58, 63; 732 NW2d 546 (2007); *People v Erb,* 48 Mich App 622, 631; 211 NW2d 51 (1973). The defendant bears the burden of demonstrating that such an error resulted in a miscarriage of justice. *People v Brownridge (On Remand),* 237 Mich App 210, 216; 602 NW2d 584 (1999).

Defendant first claims that the prosecutor committed misconduct by introducing evidence that defendant's urine tested positive for Trenbolone. However, defendant fails to make clear in the argument section of his brief on appeal that it was a different prosecutor *in a previous trial* who had agreed not to introduce this evidence. Although the lower-court record indicates

that the current prosecutor knew of that agreement, the lower-court record does not indicate that the current prosecutor accepted the previous prosecutor's agreement with defendant. Defendant has not provided a legal basis that would require the current prosecutor to adhere to an agreement reached in a separate trial between the previous prosecutor and defendant. Further, all the cases on which defendant relies to support his claim that he relied to his detriment on the previous prosecutor's agreement involve the prosecution of one case, not a subsequent and independent prosecution. Thus, defendant's claim is rejected in this regard.

Defendant next argues that the prosecutor improperly vouched for expert witness Evans. Specifically, defendant claims that the prosecutor implied that Evans was reputable. Defense counsel had called Evans's credibility into question during closing arguments by suggesting that Evans concocted a positive steroid test in his "fancy lab" after the first test was negative. A prosecutor may fairly respond to an issue raised by the defendant. *People v Fields*, 450 Mich 94, 110-111; 538 NW2d 356 (1995). Here, the lower-court record indicates that the prosecutor merely responded to defense counsel's claim by arguing that Evans was reputable. Further, because Evans was qualified as an expert witness, the lower-court record supports the prosecutor's argument that Evans was reputable. Accordingly, defendant's claim is without merit.

Defendant also argues that the prosecutor twice improperly told the jury that defendant could be guilty of possession of anabolic steroids because he had the ability to access it. Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial. *People v Brown*, 267 Mich App

141, 152; 703 NW2d 230 (2005). Viewing the prosecutor's statements in context and as a whole, it is clear that the prosecutor properly argued that evidence presented at trial allowed the jury to draw an inference of defendant's possession. Defendant's claim in this regard is without merit.

### VI. DIRECTED VERDICT

Defendant argues that the trial court erred in denying his motion for a directed verdict on the charge of possession with intent to deliver controlled substances. He specifically claims that there was insufficient evidence of possession to submit the charge to the jury.

"When reviewing a trial court's decision on a motion for a directed verdict, this Court reviews the record de novo to determine whether the evidence presented by the prosecutor, viewed in the light most favorable to the prosecutor, could persuade a rational trier of fact that the essential elements of the crime charged were proved beyond a reasonable doubt." *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001).

The element of knowing possession with intent to deliver has two components: possession and intent. *People v Wolfe*, 440 Mich 508, 519; 489 NW2d 748 (1992). Actual physical possession is not required to meet the possession element. *Id.* at 519-520. Instead, possession may be either actual or constructive. *People v Nunez*, 242 Mich App 610, 615; 619 NW2d 550 (2000). Constructive possession of an illegal substance signifies knowledge of its presence, knowledge of its character, and the right to control it. *Id.* Because it is difficult to prove an actor's state of mind, only minimal circumstantial evidence is required. *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999). Circumstantial evidence and the reasonable inferences that arise

from the evidence can constitute satisfactory proof of possession. *Nunez, supra* at 615-616. Circumstantial evidence that a defendant had the exclusive control or dominion over property on which contraband narcotics are found is sufficient to establish that the defendant constructively possessed the narcotics. *Wolfe, supra* at 521.

Here, the trial court properly denied defendant's request for a directed verdict on the charge of possession with intent to deliver controlled substances. Sufficient evidence was presented to permit a rational trier of fact to conclude that defendant knew of the Trenbolone, knew of its character, and had the right to control it. Defendant's post office box contained Trenbolone. Donnellon testified that the Finaplix-H sent to defendant's post office box was shipped from Websa Co., a company from which defendant had made credit-card purchases. Winters testified that defendant could control access to his post office box. There were 10 packages of Finaplix-H, but no evidence of any device used to inject animals with Finaplix-H. On the other hand, the police found materials in defendant's garbage used to convert Finaplix-H for human consumption. Further, Donnellon testified that he explained to defendant that "the matter at hand was criminal, and the reason it was criminal was because we had recovered these steroids from his post box." Donnellon testified that defendant responded stating, "Oh, the Fin[a]plix." Defendant then indicated to Donnellon that "he had ordered this material over the Internet and that it was legal."

The evidence indicates that defendant had the Finaplix-H delivered to the post office box and had control of the Finaplix-H. Evidence also indicates that there was no device to inject animals with Finaplix-H, but that defendant had materials to convert Finaplix-H

for human consumption. There is sufficient evidence for a rational jury to conclude that defendant had constructive possession of a controlled substance. The trial court properly denied defendant's motion for a directed verdict.

### VII. REIMBURSEMENT OF PROSECUTION COSTS

Defendant argues that the trial court erred in imposing costs under MCL 771.3 to reimburse the prosecution's expense of an expert witness at trial.

Statutory interpretation is a question of law considered de novo on appeal. *People v Davis*, 468 Mich 77, 79; 658 NW2d 800 (2003).

At sentencing, the trial court stated that defendant must pay a "$60.00 criminal victim's rights fee, probation supervision fees at the rate of $40.00 per month for a total of $480.00, state costs of $120.00; court costs of $3000.00." The trial court further stated, "I'm going to require you to make restitution in this case, but the restitution I'm going to set at $5,000.00."

At a later hearing, defendant challenged as improper restitution the $5,000 cost of the prosecution's expert witness. The trial court indicated, "Well, I'm going to deny it under the restitution statute." The trial court then stated, "[B]ut under the probationary statute I think it's allowed. Now, however, I still have a right to look at the, at the request and see if it's reasonable." The trial court then reduced the expert's fees to only include court time. The trial court ordered that "defendant must pay the amount of $4,200.00 as a condition of Probation pursuant to MCL 771.3(5) as representing the costs incurred by the People in hiring an expert witness for Defendant's trial."

MCL 771.3(2)(c) provides that, "[a]s a condition of probation, the court may require the probationer to . . .

[p]ay costs pursuant to subsection (5)." MCL 771.3(5) states that, "[i]f the court requires the probationer to pay costs under subsection (2), the costs shall be limited to expenses specifically incurred in prosecuting the defendant or providing legal assistance to the defendant and supervision of the probationer." Here, there is no real dispute that expert witness costs were "expenses specifically incurred in prosecuting the defendant . . . ." Thus, the costs were properly awarded.

Defendant also challenges the amount of the costs imposed.

MCL 771.3(6), provides:

> If the court imposes costs under subsection (2) as part of a sentence of probation, all of the following apply:

> (a) The court shall not require a probationer to pay costs under subsection (2) unless the probationer is or will be able to pay them during the term of probation. In determining the amount and method of payment of costs under subsection (2), the court shall take into account the probationer's financial resources and the nature of the burden that payment of costs will impose, with due regard to his or her other obligations.

Defendant argues, in this regard, that the trial court did not comply with MCL 771.3 because it failed to determine if defendant could afford to pay the costs. However, the trial court had previously addressed defendant's concern. Defendant argued that MCL 771.3 "specifically states the Court must take into account when assessing the fines and fees the person's financial status at that time and during . . . ." The trial court interjected and stated, "Excuse me. And I also can take into consideration your potential for employment." Here, the trial court specifically concluded that defendant's decision not to work full-time but to go to school full-time resulted in his inability to pay. The trial court

properly considered defendant's ability to pay under the statute, and concluded defendant could pay if he chose to do so. Therefore, the trial court did not err in imposing costs under MCL 771.3 to reimburse the prosecution's expense for an expert witness at trial.

VIII. ISSUES RAISED IN DEFENDANT'S
STANDARD 4 BRIEF ON APPEAL

A. EFFECTIVE ASSISTANCE OF COUNSEL

Because defendant did not raise this issue in a motion for a new trial or request for an evidentiary hearing pursuant to *People v Ginther*, 390 Mich 436, 443; 212 NW2d 922 (1973), our review is limited to mistakes apparent from the record. *People v Mack*, 265 Mich App 122, 125; 695 NW2d 342 (2005).

The denial of effective assistance of counsel is a mixed question of fact and constitutional law, which are reviewed, respectively, for clear error and de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).

> To establish a claim of ineffective assistance of counsel, a defendant must show that counsel's performance fell below an objective standard of reasonableness and that, but for defense counsel's errors, there was a reasonable probability that the result of the proceeding would have been different. *People v Stanaway*, 446 Mich 643, 687-688; 521 NW2d 557 (1994). A defendant must affirmatively demonstrate that counsel's performance was objectively unreasonable and so prejudicial as to deprive him of a fair trial. *People v Pickens*, 446 Mich 298, 303; 521 NW2d 797 (1994). The defendant must also overcome the presumption that the challenged action might be considered sound trial strategy. *People v Tommolino*, 187 Mich App 14, 17; 466 NW2d 315 (1991), citing *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). [*People v Knapp*, 244 Mich App 361, 385-386; 624 NW2d 227 (2001).]

Defendant in his Standard 4 Brief argues defense counsel was ineffective for the following 10 reasons: (1) defense counsel stipulated regarding the "statutory interpretation" of Rule 338.3122(2); (2) defense counsel failed to challenge the trial court's denial of the motion to suppress Graves's computer records; (3) defense counsel failed to introduce exculpatory evidence in the form of a private investigator's report; (4) defense counsel failed to challenge the issue of Graves's consent to search; (5) defense counsel failed to challenge the trial court's disregard of MCR 6.419 and MCR 6.431; (6) defense counsel failed to file postjudgment challenges to the rulings regarding restitution, fines, and fees; (7) defense counsel failed to challenge the trial court's failure to provide defendant the presentence investigation report (PSIR) one day before sentencing; (8) defense counsel failed at the time of sentencing to correct the trial court's failure to provide defendant the PSIR one day before sentencing; (9) defense counsel failed to object to the jury instruction that concluded Finaplix-H was a controlled substance; and (10) defense counsel failed to object to any of the prosecution's egregious conduct.

Defendant's first claim of error is without merit for the reasons stated in part I of this opinion. Defendant's second claim of error is without merit for the reasons stated in part III of this opinion. Defendant's third claim of error is without merit because defendant wholly fails to address the merits of this claim and does not mention the private investigator's report in the argument section of his brief on appeal. A defendant must affirmatively demonstrate that counsel's performance was objectively unreasonable and so prejudicial as to deprive the defendant of a fair trial. *Pickens, supra* at 303. Defendant here fails to do so. Defendant's fourth claim of error is without merit because Graves's testi-

mony at the preliminary examination expressly indicates that she consented to the search of the computer by the police. Nothing in the lower-court record indicates otherwise. It is well established that defense counsel is not ineffective for failing to pursue a futile motion. *Mack, supra* at 130. Defendant's fifth claim of error is without merit for the reasons stated in part X of this opinion. Defendant's sixth claim of error is without merit for the reasons stated in part VII of this opinion. Defendant's seventh and eighth claims of error are without merit because defendant fails to address the merits of the claims, and further fails to articulate prejudice arising from him not having a PSIR one day before sentencing. Defendant's ninth claim of error is without merit for the reasons stated in part II of this opinion. Finally, defendant's tenth claim of error is without merit for the reasons stated in part V, of this opinion.

In short, defendant has failed to establish ineffective assistance of counsel in any regard.

### B. VIOLATION OF *GARRITY*

Defendant next claims that his rights under *Garrity v New Jersey*, 385 US 493; 87 S Ct 616; 17 L Ed 2d 562 (1967), were violated.

In *Garrity, supra* at 500, the United States Supreme Court held that self-incriminatory statements from a law-enforcement officer procured under the threat of discharge could not be used in subsequent criminal proceedings against the declarant. Essentially, a *Garrity* hearing allows "the interviewee to answer questions with the knowledge that any statements elicited therein will not be used against him in criminal proceedings." *Lenawee Co Sheriff v Police Officers Labor Council*, 239 Mich App 111, 115 n 2; 607 NW2d 742 (1999).

Here, defendant claims that evidence procured during a *Garrity* interview was used as the basis for the affidavit leading to the search warrant to seize defendant's medical records. At the interview, defendant signed a form indicating that "any information discovered as a result of the interview would not be used against [defendant] in any criminal case." During the interview, defendant purportedly identified his physician, Dr. Hartz, and indicated that Dr. Hartz prescribed him Androgel. The search warrant avers:

> Your affiant, in contact with Lt. Donnellon, has learned that the family doctor of Craig Gordon Brown is Dr. Hartz at the Lakeside Medical Group in Oxford. That Craig Brown claims to have seen Dr. Hartz on 2-21-03 and obtained a prescription for the steroid Androgel which he uses for a disorder of Hypogondism.

Specifically, defendant argues that during his *Garrity* interview, under threat of termination of employment, he was required to divulge that his physician, Dr. Hartz, prescribed him a testosterone steroid. Defendant claims that because this information was used as the basis for the affidavit leading to the search warrant to seize defendant's medical records, his *Garrity* rights were violated.

Defendant has failed to show that any evidence procured during his *Garrity* interview was used against him. Defendant admits, in his Standard 4 brief, that his "actual *Garrity* statements were not specifically used against [him], *per-se*, used at trial." Defendant notes that the prosecutor mentioned Androgen at trial, but there was no objection and defendant does not claim error with regard to the prosecutor's mentioning of Androgen.

Defendant's primary argument is that although his *Garrity* "statements were not used against him, *per-se*,

at trial . . . the statements were used as the basis for the
affidavit leading to the search warrant to seize [defen-
dant's] medical records for the purpose of introducing
evidence derived thereof against [defendant] at a 'criminal
proceeding.' " However, defendant fails to identify any
evidence presented at trial that resulted from the search
warrant to seize defendant's medical records. In other
words, defendant fails to identify record evidence gleaned
from his medical file that was used as evidence against
him. Thus, while defendant's argument that the use of his
*Garrity* statements to secure a search warrant may have
merit, defendant does not show that any of his *Garrity*
statements or, more relevant to his claim, that the fruit of
his *Garrity* statements, were used against him in this
prosecution.

### C. POSTTRIAL MOTIONS

Whether to grant a new trial is in the trial court's
discretion, and its decision will not be reversed absent
an abuse of that discretion. *People v Cress*, 468 Mich
678, 691; 664 NW2d 174 (2003). An abuse of discretion
occurs when the result is outside the range of principled
outcomes. *Barnett v Hidalgo*, 478 Mich 151, 158; 732
NW2d 472 (2007).

MCR 6.419(E) states, "The court must state orally on
the record or in a written ruling made a part of the
record its reasons for granting or denying a motion for
a directed verdict of acquittal and for conditionally
granting or denying a motion for a new trial." Likewise,
MCR 6.431(B) provides:

On the defendant's motion, the court may order a new
trial on any ground that would support appellate reversal
of the conviction or because it believes that the verdict has
resulted in a miscarriage of justice. The court must state its

reasons for granting or denying a new trial orally on the record or in a written ruling made a part of the record.

Defendant argues in his Standard 4 brief that the trial court erred in not stating on the record its reasons for denying defendant's motion for mistrial.

At the May 17, 2004, motion hearing, defendant, acting pro se, essentially presented the same argument presented in defendant's brief on appeal addressing the constitutionality of Rule 338.3122(2), which we addressed in part II of this opinion. The trial court denied the motion without further comment; however, the record of the motion hearing indicates that the trial court had previously considered and rejected all of defendant's arguments related to this issue. Further, the trial court's reasons for denying defendant's motion can be inferred from its jury instructions in regard to Trenbolone, which state in relevant part that the substance at issue in this case is Trenbolone, which is a controlled substance "unless it is expressly intended for administration through implant to cattle or other non-human species." Accordingly, the trial court stated its reasons on the record in regard to the legality of Trenbolone, and reversal is not required.

### D. REMAINING ISSUES

Defendant next reiterates in his Standard 4 brief that the search of his apartment was unconstitutional. This issue has, however, previously been addressed in part IV, of this opinion and we conclude defendant is not entitled to relief.

Lastly, defendant argues that he was denied a fair trial through the effect of cumulative errors. We review this issue to determine if the combination of alleged errors denied defendant a fair trial. *Knapp, supra* at 387-388.

> The cumulative effect of several errors can constitute sufficient prejudice to warrant reversal even when any one of the errors alone would not merit reversal, but the cumulative effect of the errors must undermine the confidence in the reliability of the verdict before a new trial is granted. *People v LeBlanc*, 465 Mich 575, 591: 640 NW2d 246 (2002). Absent the establishment of errors, there can be no cumulative effect of errors meriting reversal. *People v Mayhew*, 236 Mich App 112, 128; 600 NW2d 370 (1999). [*People v Dobek* 274 Mich App 58, 106; 732 NW2d 546 (2007).]

Here, defendant has failed to show any error, and, thus, his claim of cumulative error must be rejected.

Affirmed.

O'CONNELL, J., concurred.

WHITE, J. (*concurring in part and dissenting in part*). I respectfully dissent from the majority's conclusion that Mich Admin Code, R 338.3122(2) plainly and unambiguously provides that possession of Trenbolone in a form that is "expressly intended for administration through implants to cattle or other nonhuman species and which has been approved by the United States drug enforcement administration for such administration" is illegal if the possessor intends the Trenbolone for human consumption.

Defendant was convicted of possession and delivery of Trenbolone in a form that was expressly intended for administration through implants to nonhuman animals. The question is whether the Trenbolone defendant possessed is a controlled substance. Mich Admin Code, R 338.3122(1) states:

> Unless specifically excepted or unless listed in another schedule, any material, compound, mixture, or preparation that contains any quantity of an anabolic steroid, including

its salts, isomers, and salts of isomers if the existence of such salts of isomers is possible within the specific chemical designation, is included in schedule 3. As used in this rule, the term "anabolic steroid" means any of the following drugs or hormonal substances which are chemically and pharmacologically related to testosterone, other than estrogens, progestins, and corticosteroids, and which promote muscle growth[.]

Mich Admin Code, R 338.3122(1)(w) expressly identifies "Trenbolone." Thus, unless specifically excepted, a mixture containing Trenbolone is included in schedule 3.

Rule 338.3122(2) states:

An anabolic steroid which is expressly intended for administration through implants to cattle or other nonhuman species and which has been approved by the United States drug enforcement administration for such administration is specifically excepted from schedule 3.

Trenbolone is an anabolic steroid that has been approved by the United States Secretary of Health and Human Services for administration through implants to cattle or other nonhuman species. 21 CFR 1308. Defendant possessed Trenbolone in implant form.

Read in conjunction, subsection 1 of Michigan Board of Pharmacy Rule 338.3122 lists Trenbolone as a schedule 3 substance, making any mixture containing Trenbolone a schedule 3 substance, but subsection 2 of the rule then excepts from schedule 3 any anabolic steroid which is "expressly intended for administration through implants to cattle or other nonhuman species and which has been approved by the United States drug enforcement administration for such administration . . . ."

The majority concludes that the rule clearly and unambiguously focuses on the possessor's intent with

respect to the substance, rather than the intent of the manufacturer or the seller. The majority concludes that although the Trebolone at issue is expressly intended for administration through implants to cattle, and would therefore not be a controlled substance in the hands of someone who intended to administer it to an animal, it is nevertheless a controlled substance in the hands of someone who does not intend to use it for this purpose.

I do not agree that no guesswork is required in applying Rule 338.3122, or that it plainly and unambiguously identifies Trenbolone as a controlled substance and only exempts its possession if the possessor expressly intends that the drug be administered through implants to cattle or other nonhuman species. Rule 338.3122 does not unambiguously so provide. Rather, it identifies Trenbolone as a schedule 3 controlled substance and then states that if it is expressly intended for administration through implants to animals, it, the Trebolone, rather than its use, is excepted from schedule 3. The focus is on the substance and whether it is a controlled 3 substance. The clause "and which has been approved by the United States drug enforcement administration for such administration" supports this interpretation. The United States Drug Enforcement Administration does not approve the possession and use of a drug by individuals, rather it approves the manufacture and use of a drug for specific purposes in specific forms. The phrase "which is expressly intended for administration through implants to cattle or other nonhuman species and which has been approved by the United States drug enforcement administration for such administration" strongly implies that the word "intended" is directed at the use for which the drug is expressly made and approved, and not the use intended by the possessor. A person of ordinary

intelligence would not be on notice that Trenbolone that is in a form expressly intended for administration through implants to cattle is a schedule 3 substance.