# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

       Plaintiff-Appellee,

v

BILLIE DESHAWN MCKINNEY,

       Defendant-Appellant.

UNPUBLISHED
September 10, 2015

No. 321843
Kent Circuit Court
LC No. 13-009813-FC

Before: BOONSTRA, P.J., and MURPHY and MARKEY, JJ.

PER CURIAM.

Defendant was convicted by a jury of assault with intent to murder (AWIM), MCL 750.83; possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b; and carrying a concealed weapon (CCW), MCL 750.227. He was sentenced as a second-offense habitual offender, MCL 769.10, to concurrent terms of 27 to 50 years' imprisonment for the AWIM conviction and 2 to 5 years' imprisonment for the CCW conviction, each to be served consecutive to a 2-year term of imprisonment for the felony-firearm conviction. He now appeals his convictions by right. We affirm.

Defendant's convictions stem from a shooting that occurred at a house party in Kentwood, Michigan, on the evening of July 14, 2013. On that date, Alicia Martin, a recent high school graduate, hosted a party to celebrate her graduation. The party was held in her backyard, where there was an above-ground pool enclosed by a deck. Martin testified at trial that she only invited approximately 50 friends, but word of the party quickly spread to others and by 10:00 or 11:00 p.m., there were approximately 150 people at the house. According to multiple witnesses, among the partygoers was a group of individuals known to be associated with a local gang called "Bouldercrest."

Multiple witnesses testified at defendant's trial. While each witness's account of the events varied slightly, the majority consistently testified that around 11:30 p.m., a group of between six and ten individuals arrived at the party and entered the backyard. Included in this group was defendant. According to multiple witnesses, several of these individuals, including defendant, were associated with the "Bemis" gang, another local gang and a rival of the "Bouldercrest" gang. From the moment the "Bemis" gang entered the backyard, there was "conflict." According to various witnesses, members from the "Bemis" gang, who were then standing near the stairs to the pool deck, began yelling at members of the "Bouldercrest" gang,

-1-

who were standing on the deck. At some point, defendant was punched and fell to the ground. A fight then ensued between defendant and other members of his gang and members of the "Bouldercrest" gang. During the fight, gunshots erupted on the pool deck. Several people were injured, including two members of the "Bouldercrest" gang and an innocent bystander.

Witness identifications of the shooter varied; however, several witnesses recalled that the shooter was wearing an orange, "orangish," or "bright" shirt, which matched the description of the shirt defendant was wearing that night. Moreover, at least one witness identified the shooter as the same individual who had earlier been punched. Finally, several witnesses specifically identified defendant as the shooter. As a result of eyewitness identifications, defendant was eventually arrested. While in the Kent County jail, defendant made incriminating statements about the shooting to a fellow inmate, Jacqte Beal, some of which were recorded by Beal while he was wearing a recording device. Specifically, among other things, defendant admitted being one of two shooters and identified the type of weapon he used. Defendant also elicited Beal's help in sending a letter to defendant's girlfriend, Sierra Wyant, in which he asked Wyant to provide an alibi for defendant. The letter, along with portions of the recorded conversation between defendant and Beal, were admitted at defendant's trial.

On appeal, defendant first argues that the prosecution committed misconduct when it threatened witnesses with perjury charges and in some instances actually charged witnesses with perjury. We review this unpreserved claim of prosecutorial misconduct for plain error affecting defendant's substantial rights. *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). A plain error affects a defendant's substantial rights when it affects the outcome of the proceedings. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). "The test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *Brown*, 279 Mich App at 134. Encompassed within a criminal defendant's right to due process is the right to present witnesses in defense of the charges. *People v Hooper*, 157 Mich App 669, 675; 403 NW2d 605 (1987). As such, a prosecutor may not intimidate witnesses, either in or out of court. *People v Clark*, 172 Mich App 407, 409; 432 NW2d 726 (1988), citing *People v Pena*, 383 Mich 402, 406; 175 NW2d 767 (1970). Threats from law enforcement officers may be attributed to the prosecution. *People v Stacy*, 193 Mich App 19, 25; 484 NW2d 675 (1992).

The record reveals that there was a general unwillingness on the part of many witnesses to fully cooperate with the police and the prosecution, either because they were involved in the incident, had loyalties to the persons involved, or feared repercussions from "snitching" on gang members. As such, police had a difficult time interviewing the witnesses, which resulted in the decision to hold an investigative subpoena hearing. More than 20 witnesses were subpoenaed for the hearing and testified under oath. Each witness was informed at the investigative subpoena hearing that false testimony could result in a perjury charge. The record also reveals that several of the witnesses were later subpoenaed to compel their appearance at the preliminary examination. Likewise, many of the witnesses were subpoenaed to compel their appearance at trial, and some witnesses were even incarcerated on material witness warrants to compel their appearance at trial. Three witnesses testified at trial that they were ultimately charged with perjury in connection with their testimony under oath at either the subpoena hearing or the preliminary examination.

-2-

At the outset, defendant does not appear to argue, and there is no authority to support, that the investigators' mere act of convening an investigative subpoena hearing was improper. To the contrary, such proceedings are lawful. See MCL 767A.1 *et seq.* Likewise, defendant concedes that it was not improper for the investigators to inform each of the witnesses that false testimony at the investigative subpoena hearing could result in perjury charges. See MCL 767A.9; *People v Layher*, 238 Mich App 573, 587; 607 NW2d 91 (1999); *People v Robbins*, 131 Mich App 429, 439; 346 NW2d 333 (1984). Finally, defendant does not appear to argue, and there is no authority to support, that the prosecution's acts of subpoenaing several witnesses for the preliminary examination and trial, or of obtaining material witness warrants to compel several witnesses' appearance at trial, were in any way improper. To the contrary, these are also lawful methods of furthering the truth-seeking function of the judicial process. See MCL 767.40a; MCL 767.35. Instead, defendant's claim is limited to his argument that the prosecution committed misconduct when it singled out one defense witness, Leontae Craig, to more emphatically threaten with perjury charges than the other witnesses, causing him to not testify.

The record does not support the first portion of defendant's argument. Two detectives testified that they treated Craig the same as the other witnesses that they interviewed. One detective did acknowledge telling Craig during the interview that he did not believe his story and that "if we were able to prove his statements were false, that he could be charged with perjury," which could carry a maximum sentence of life imprisonment given the nature of the case. See MCL 767A.9(1)(b), providing that the punishment for a false statement under oath "made during the investigation of a crime punishable by imprisonment for life, by imprisonment for life or for any term of years." Although the defense subpoenaed Craig to testify at trial, nothing in the record establishes that it was not Craig's free and voluntary choice to not testify. *Robbins*, 131 Mich App at 440. The detective did nothing improper by telling Craig during the interview that the detective believed Craig's statements were untrue and that if the witness lied while testifying, and the police could prove that the testimony was untrue, the witness could be charged with perjury. We conclude this truthful admonition regarding the *possibility* of perjury charges falls within the general rule that "a prosecutor [here, the police] may inform a witness that false testimony could result in a perjury charge." *Layher*, 238 Mich App at 587.

Defendant bases his argument to the contrary on *Webb v Texas*, 409 US 95, 97-98; 93 S Ct 351; 34 L Ed 2d 330 (1972). The facts of this present case, however, are far different from those in *Webb*, where it was the trial judge who "gratuitously singled out [the sole defense] witness for a lengthy admonition on the dangers of perjury." *Webb*, 409 US at 97. Given the trial judge's powerful position over the witness and his strong language, the Court found that the judge's remarks "could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Id*. at 98. Thus, the Court concluded that "the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id*. The present case is not at all like *Webb*. Here, Craig was not a lone witness but one of many witnesses, several of whom were uncooperative with the police and provided untruthful statements. Further, the police did not occupy a position of immediate power over Craig regarding his testimony as did the judge in *Webb*. Moreover, the police here couched an admonition regarding perjury tentatively, stating that "if we were *able to prove* his statements were false that he *could be* charged with perjury . . .

." Thus, we reject defendant's argument that the present case is analogous to, or controlled by *Webb*.

Defendant also relies on our Supreme Court's opinion in *Pena*, and this Court's opinion in *Stacy*. In *Pena*, the prosecutor sent a letter to each of the defendant's three listed alibi witnesses a week before trial that quoted Michigan's perjury statute. *Pena*, 383 Mich at 405. Two of the defense witnesses testified at trial in support of the defendant's alibi; the prosecutor called the third witness who professed lack of memory regarding the pertinent time. *Id*. at 407. Three justices would have held that reversal of the defendant's conviction was required by the prosecution's intimidating tactic because "[a] prosecutor may impeach a witness in court but he may not intimidate him—in or out of court." *Id*. at 406. A majority of the Court, however, merely remanded the case to the trial court for its determination whether, in fact, "the prosecutor's letter did intimidate the witnesses." *Id*. at 407-408. If no witness intimidation occurred, the trial court was directed to deny the defendant's motion for a new trial.[1] *Id*. Subsequently, this Court held in *Layher*, 238 Mich App at 587, which applies to this case, that "a prosecutor may inform a witness that false testimony could result in a perjury charge."

This Court's opinion in *Stacy* also does not assist defendant's argument. In that case, the defendant argued that the police used the threat of prosecution to gain the cooperative testimony of a key witness, the defendant's girlfriend. *Stacy*, 193 Mich App at 25-27. The Court held that the unpreserved claim of error did not warrant relief because the jury was presented with evidence of the police statements to the witness and had the opportunity to assess the witness's credibility. *Id*. at 27-28. Under these circumstances, the Court concluded that manifest injustice had not occurred. *Id*. at 30. Similarly, in the present case, the jury heard testimony regarding the police contacts with Craig and other witnesses; therefore, it could both judge the credibility of the witnesses and weigh the investigative tactics of the police when assessing the overall strength prosecution's case. Thus, as in *Stacy*, we cannot conclude that Craig's absence at trial prejudiced defendant.

Furthermore, to establish prejudice regarding this unpreserved claim, defendant is required to show "that the error affected the outcome of the lower court proceedings." *Carines*, 460 Mich at 763. In this case, Craig did not testify at any stage of the prosecution, and the substance of his statements during his interview with the police was not divulged to the jury. So it is not apparent from the lower court record whether Craig would have in fact testified favorably to defendant. Moreover, defendant has not provided anything to this Court, such as an affidavit, indicating what the substance of Craig's testimony would have been. Without a record of Craig's potential testimony, it is impossible to conclude that the outcome of defendant's trial would have been different. See *People v Davis*, 250 Mich App 357, 369; 649 NW2d 94 (2002).

---

[1] "The clear rule in Michigan is that a majority of the Court must agree on a ground for decision in order to make that binding precedent for future cases. If there is merely a majority for a particular result, then the parties to the case are bound by the judgment but the case is not authority beyond the immediate parties." *Spectrum Health Hosps v Farm Bureau Mut Ins Co*, 492 Mich 503, 535; 821 NW2d 117 (2012) (citations mitted).

Even assuming for the sake of the argument that Craig would have testified favorably for defendant, defendant cannot establish that the outcome of the trial would have been different in light of the overwhelming evidence supporting defendant's convictions. *Carines*, 460 Mich at 763-764.

With respect to the second portion of defendant's argument about the witnesses charged with perjury, we are not convinced that the witness's trial testimony resulted from improper intimidation. The record reveals that a total of three individuals were charged with perjury stemming from their testimony either at the preliminary examination or the investigative subpoena hearing. The prosecution elicited this information, as well as the basis for the charges, from each of the witnesses at trial. Still, there was no indication that any of the witnesses were intimidated by those charges into testifying. And, at no time did the prosecutor attempt to bolster the witness's credibility by suggesting that the witnesses were now telling the truth or by indicating that the perjury charges would be dropped in exchange for their testimony. In any event, the other evidence in the case was more than sufficient to support defendant's convictions, and the alleged intimidation therefore did not affect the outcome of defendant's case.

Defendant next argues that the trial court erred in allowing the admission of audio recordings of the conversation he had with Beal while in jail. We disagree. We review a trial court's decision whether to admit evidence for an abuse of discretion. *People v Lukity*, 460 Mich 484, 488; 596 NW2d 607 (1999). "A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes." *People v Duncan*, 494 Mich 713, 722-723; 835 NW2d 399 (2013).

As at trial, the basis for defendant's challenge to the audio recordings is that the recordings were of poor quality, difficult to understand, and unintelligible at times. The trial court acknowledged as much after reviewing the recordings. Nonetheless, the trial court identified parts of the recordings where defendant could be heard making "potentially incriminating statements," such that the jury should be allowed to hear them. Based on our independent review of the recordings, we cannot conclude that the trial court abused its discretion. While the tapes were not of the best quality and contained unintelligible portions, they were not so unintelligible as to be inadmissible as a matter of law. See *People v Karalia*, 35 Mich App 541, 545-546; 192 NW2d 676 (1971); *People v Frison*, 25 Mich App 146, 147-148; 181 NW2d 75 (1970). Moreover, we note that in allowing the recordings to be played, the trial court carefully instructed the jury to use its independent judgment as to the value of the recordings and to disregard them if it found them to be of little value. We also note that Beal testified at trial and personally recalled some of the incriminating statements defendant made, thereby further authenticating the recordings.

Defendant next argues in his brief filed in propria persona that the trial court lacked subject matter jurisdiction over him because the complaint and warrant were defective. We disagree. Subject matter jurisdiction refers to a court's right to exercise judicial power over a class of cases, and is not dependent on the particular facts of the case. *People v Kiyoshk*, 493 Mich 923; 825 NW2d 56 (2013). Circuit courts are courts of general jurisdiction and have subject matter jurisdiction over all felony cases. *People v Goecke*, 457 Mich 442, 458; 579 NW2d 868 (1998). In this case, the lower court record contains an information charging defendant with three felonies, which was filed after the preliminary examination. The circuit

-5-

court acquired subject matter jurisdiction over defendant's case when the district court filed in the circuit court the return of examination, MCR 6.110(G). *Goecke*, 457 Mich at 458-459. To the extent defendant argues that the trial court lacked *personal* jurisdiction over him, he has waived such a challenge by appearing before the trial court and waiving his arraignment. See *Kiyoshk*, 493 Mich at 924; *People v Lown*, 488 Mich 242, 268; 794 NW2d 9 (2011).

Next, defendant argues that the district court magistrate lacked probable cause to issue an arrest warrant because the complaint was defective because probable cause itself was lacking, and the warrant was defective because it was never "returned." We review these unpreserved claims for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763.

At the outset, defendant's argument that the district court could not issue an arrest warrant because the complaint was defective lacks merit. The complaint, submitted with the arrest warrant and an affidavit of probable cause, listed the charged offenses, the statutory citations for the charges, and the factual predicate for the charges. The affidavit more specifically set forth this information. Each of these documents was sworn to before the magistrate. The complaint therefore satisfied the basic requirements of MCR 6.101(A). Likewise, the magistrate's probable cause finding was not erroneous. A finding of probable cause on a complaint is proper where the complaint and supporting facts are sufficient to enable the magistrate "to make the judgment that the charges are not capricious and are sufficiently supported to justify bringing into play further steps of the criminal process." *Jaben v United States*, 381 US 214, 224-225; 85 S Ct 1365; 14 L Ed 2d 345 (1965). The standard of probable cause to support an arrest "looks only to the probability that the person committed the crime as established at the time of arrest" without regard to whether the prosecution can ultimately prove guilt at trial. *People v Cohen*, 294 Mich App 70, 76; 816 NW2d 474 (2011) (citation omitted). Based on our review of the complaint and affidavit, the magistrate had more than enough information to find probable cause that the offenses were committed and probable cause to believe that defendant committed them. Finally, while defendant correctly argues that the warrant was never "returned," as required by MCL 764.1b and MCR 6.102(E), defendant was not prejudiced by this error. *Carines*, 460 Mich at 763.

We affirm.

/s/ Mark T. Boonstra
/s/ William B. Murphy
/s/ Jane E. Markey