# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

KEVIN JAY HAAN,

        Defendant-Appellant.

UNPUBLISHED
May 26, 2015

No. 319944
Muskegon Circuit Court
LC No. 12-062735-FH

Before: DONOFRIO, P.J., and O'CONNELL and RONAYNE KRAUSE, JJ.

PER CURIAM.

Defendant, Kevin Jay Haan, appeals as of right his jury trial convictions of guilty but mentally ill for fleeing and eluding, MCL 750.479a(3); third-offense operating while intoxicated, MCL 257.625(9)(c); and resisting a police officer, MCL 750.81d(1). We affirm defendant's convictions, but we remand for resentencing.

Defendant, a former Allegan County Sheriff's Deputy, led police officers on a high-speed chase while intoxicated on October 15, 2012. During the course of the chase, defendant displayed his middle finger to a pursuing officer, ran over a spike strip, successfully maneuvered out of an officer's attempt to immobilize his truck, struck another driver's vehicle, and finally came to rest after running into a building in Muskegon. Defendant failed to comply with demands to exit the truck, and officers forcibly removed him. Officers found a half-empty 750 milliliter bottle of vodka in defendant's truck. A blood analysis report showed that defendant's blood alcohol content was 0.31 grams per 100 milliliters of blood, almost four times the 0.08 statutory limit.

Defendant pursued an insanity defense, claiming that he had experienced depression, anxiety, and auditory hallucinations following a 1995 stroke that damaged his brain tissue. According to defendant, a demonic voice in his head told him he was going to hell and promised to make life miserable enough for him that he would commit suicide. Defendant alleges that the demon criticized his failures as a father to his children and vowed to haunt him and his children until his death. Defendant began drinking as a means of self-medication and eventually sought treatment for alcoholism and depression on numerous occasions between 1997 and 2012. Defendant attempted suicide at least once with a firearm and intentionally drove his son's truck into a tree at high speeds while intoxicated in early September 2012. Around that time, two of defendant's children had sought treatment for depression. Defendant testified that on October

-1-

15, 2012, his demon told him that his children were suffering because he was still alive and that "this has got to be taken care of . . . it's gotta be an accident." The demon told defendant to drive toward Muskegon, and defendant purchased and consumed vodka on the way. Defendant clarified that the demon did not tell him to buy the alcohol; instead, he made that choice of his own free will.

## I. MEDICAL RECORDS

We first address defendant's argument that defense counsel was constitutionally ineffective in failing to admit defendant's medical records into evidence at trial. Whether a defendant received ineffective assistance of trial counsel presents a mixed question of fact and constitutional law. *People v Douglas*, 496 Mich 557, 566; 852 NW2d 587 (2014). A trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). But because this Court denied defendant's request for a remand for an evidentiary hearing, our review is limited to mistakes apparent on the record. *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

In order to succeed on an ineffective assistance of counsel claim, defendant must show that (1) trial counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's error, the result of the proceedings would have been different. *People v Lopez*, 305 Mich App 686, 694; 854 NW2d 205 (2014). Regarding this second requirement, "'[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *People v Allen*, ___ Mich App ___; ___ NW2d ___ (Docket No. 318560, issued April 30, 2015), slip op, p 4, quoting *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

In light of the defense's concession of the facts of the offenses, defendant's medical records were relevant to the only factual dispute at trial—whether he was legally insane under MCL 768.21a. Defense counsel seemed to recognize the significance of these records, as he sought to admit them into evidence. However, defense counsel failed to authenticate them as records of regularly conducted activity under MRE 803(6) and expressed surprise when the prosecution demanded certified copies of the records, even though he acknowledged that the prosecutor was entitled to do so.[1]

The Michigan Supreme Court has held that defense counsel renders deficient performance where "the only reason [counsel] failed to pursue [relevant records'] admission was that he mistakenly believed no additional steps were required for their admission and became flustered when the prosecution successfully objected to their admittance because of the lack of a foundation." *People v Armstrong*, 490 Mich 281, 290; 806 NW2d 676 (2011). In *Armstrong*, the Court held that defense counsel's failure to properly authenticate and admit cellular

---

[1] The parties thereafter agreed that the medical records would not be admitted into evidence, but each party's expert witnesses would be allowed to testify to the content of the records insofar as the experts directly quoted those records within their personal reports.

telephone records constituted deficient performance where those records would have undermined the credibility of the prosecution's main witness. *Id.* at 290-291. Here, defendant's medical records would have provided defense counsel with a clear answer to the prosecution expert's assertions that most or all discussion of defendant's hallucinations in his medical records related back to his initial 2006 complaint. Defense counsel's errors below, like those of defense counsel in *Armstrong*, did not constitute sound trial strategy. *Id.* As in *Armstrong*, "[a]ny attorney acting reasonably" would have properly admitted defendant's medical records into evidence. *Id.* at 290.

However, we conclude that defendant cannot establish the requisite prejudice to succeed on his claim on ineffective assistance of counsel. Defendant claims that had the medical records been admitted into evidence, they would have severely impeached the testimony of the prosecution's expert witness, Judith Block.

MCL 768.21a governs the defense of legal insanity and provided the following at the time of defendant's trial:[2]

> (1) It is an affirmative defense to a prosecution for a criminal offense that the defendant was legally insane when he or she committed the acts constituting the offense. An individual is legally insane if, as a result of mental illness as defined in section 400a of the mental health code, . . . that person lacks substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law. Mental illness . . . does not otherwise constitute a defense of legal insanity.

> (2) An individual who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his or her alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances.

> (3) The defendant has the burden of proving the defense of insanity by a preponderance of the evidence.

Block opined that defendant did not meet the definition of being mentally ill, MCL 330.1400(g), at the time of the crimes. She thought that defendant was fabricating the story of the demon talking to him at the time of the incident. Block further stated that even if defendant were mentally ill, he nevertheless did not meet the requirements of being legally insane because he had the capacity to appreciate the wrongfulness of his conduct and he had the ability to conform his conduct to the requirements of the law. Block testified that she relied, in part, on defendant's medical records, which according to her, as a whole did not reflect a continued history of psychosis or hallucinations. She explained that "you can find a sentence here or a sentence there" in the records regarding hearing voices, "but the vast number of progress notes of all the sessions [defendant] goes to doesn't talk about hearing voices or demons or psychosis."

---

[2] MCL 768.21a was amended afterward in 2014 and has substantially the same content. 76 PA 2014.

Instead, Block said that the totality of the evidence indicated that hallucination "isn't what [defendant's] mental illness is about." She noted that most of the references to defendant hearing voices in the medical records were referring to his original experience of hearing the demon in 2006 and did not reflect his condition at the time the various entries were made. Furthermore, Block thought it important that after defendant was arrested on October 15, 2012, and had been in counseling since September 2012, he did not mention that he heard voices until three months after the incident. Block opined that this fact demonstrated that defendant only later fabricated this story to avoid criminal responsibility.

Defense expert Priya Rao testified differently. Rao opined that defendant did suffer from a mental illness and also met the requirements of being legally insane on the date he committed the underlying acts. To support her conclusion, Rao cited numerous treatment notes from various mental health professionals in the medical records. Rao found these records significant because they explained that defendant's sudden, serious shift in personality and mental health could all stem from his 1995 stroke and brain damage. Rao opined that defendant only selectively discussed his hallucinations with doctors because he "fe[lt] the stigma" of mental illness from church and work.

The crux of defendant's argument on appeal is that without the medical records, the jury was hampered in resolving the credibility contest between the two experts. However, to the extent any of this evidence possibly could aid him, we conclude that it did not have a reasonable probability of altering the jury's verdict.

We note that while defendant sought to have over 400 pages of medical records admitted into evidence, on appeal, he only argues that nine of those pages from 2008, comprising records from five days, were truly relevant for impeaching Block's testimony. In particular, defendant claims that these pages had entries related to defendant's *ongoing* hearing of voices, contrary to Block's characterization that these entries were referring to a *prior instance* of hearing voices. We will address these records one by one.

The first record is dated March 14, 2008, and states, "[Defendant] denies [having hallucinations,] but his family tells me he has been hearing the voice of Satan telling him to do things, this may not be present with the medications." Defendant was diagnosed with "bipolar mixed severe" and "psychosis NOS (per Hx from Family)." This record is of questionable value since defendant denied having any hallucinations. Moreover, while the family reported past hallucinations, it is not clear when these supposedly occurred. They may have been referencing the 2006 incident or something more recent. Thus, the ambiguousness of the family's claim, coupled with defendant's denial of hallucinating, makes the value of the record dubious.

The next record is from March 19, 2008, which relayed a conversation from a Dr. Burkhart, "who stated that [defendant's] hallucinations while intoxicated could be related to his brain injury and that the alcohol could be [a]ffecting his brain in such a manner that he could be having some confusion." Again, it is not clear when these supposed hallucinations were occurring—if they were present and ongoing or something that only occurred in the past. Notably, that same record indicates that defendant was not diagnosed with any psychosis but instead "as having organic mood disorder secondary to a cerebrovascular accident." The record also notes that defendant "denies auditory or visual hallucinations." Again, this record is of

questionable value since, contrary to defendant's assertion, it is not clear when these hallucinations occurred.

The March 20, 2008, record indicated that defendant "gets intoxicated and while intoxicated starts hallucinating." However, that same note reflects that defendant denies having any auditory or visual hallucinations. Interestingly, this record also contains information from the Deputy Sheriff/Undersheriff, who presumably was defendant's superior while defendant worked at the Sheriff Department. The Deputy Sheriff/Undersheriff noted that while defendant was "a great policeman," "he is also a con man[;] he can put on a good face and he knows to say the right things." Dr. Jeffrey Vrielink, who authored the record entry, noted that he concurred with that assessment as well. In our view, this record has limited value for defendant. While it does reflect ongoing hallucinations while being intoxicated, it also reflects two professionals' opinions that defendant is a "con man," which would severely harm defendant's credibility and greatly aid the prosecution's theory that defendant has concocted a story to avoid criminal responsibility. Further, it contradicts defendant's defense—that he heard the demon voice before he decided to drink and drive—because the record describes the hallucinations as being *as a result* of drinking alcohol.

The March 28, 2008,[3] record again referenced defendant's hallucinations while intoxicated, but it clarified that defendant experienced these "in the past." Again, defendant denied any present auditory or visual hallucinations. Thus, this record does not support defendant's argument.

Defendant also claims that a June 25, 2008, record would have assisted his case. Under "presenting problems/reasons for referral," it states that defendant "is struggling with bi-polar, and has used alcohol as self-medication since his stroke. Symptoms include anger outbursts, anxious feelings, crying spells, depressed mood, energy level changes." Notably, there was no mention of hallucinations except under the heading of "history," where it states that defendant "reports hearing voices in 2006 (demon)." Accordingly, this record actually reinforces Block's testimony—instead of supporting defendant's position—where she stated that many of the records simply referred to defendant's previous, original hearing of voices in 2006.

Thus, contrary to defendant's view that "the records actually supported [defendant's] account of a demon telling him he had to end his life," we conclude that they are not so helpful at all. None of these identified records relates to a demon telling defendant that he had to end his life, let alone with respect to the events that occurred on October 15, 2012. And only the March 20, 2008, record explicitly places defendant's hallucinations in the present tense by using the present tense verb "gets," but that is later undermined by the subsequent entry that makes it clear that the hallucinations happened "in the past." Furthermore, whether defendant was hearing voices in 2008 is not wholly pertinent to whether he was hearing voices (and being compelled to follow their command) on October 15, 2012, over four years later. As Block explained, "the

---

[3] It appears that this may be a portion of a larger record. Unlike the other records around this time, there is no date listed except for the date it was electronically signed, which was March 28, 2008.

records that are closest in time to the offense," are most relevant. Thus, she thought the records from September 2012[4] and beyond were the most important.

And these recent records, which would have been included amongst the medical records to be admitted, do not support defendant's case of insanity. The records show that defendant's relapse in September 2012 was attributable to his breaking up with his girlfriend. Then, "after a bad week at work," he attempted to go drinking and commit "suicide by cop." Other September 2012 medical reports indicate that defendant had "[n]o psychotic symptoms." In fact, both experts agreed that defendant first mentioned hearing voices after his September 2012 relapse four months later in January 2013. In a January 30, 2013, record, it states that defendant "spoke briefly about his hallucinating experience in 2000 and then again in Oct 2012 which led to relapse."

In sum, although they offered different opinions, we do not view this case as much as a credibility contest between the experts.[5] Instead, it was a credibility contest between what defendant said at trial and what defendant said in counseling. Defendant at trial contended that he was compelled to obey a demon telling him to kill himself on October 15, 2012, in order to save his children, but the records reveal that defendant initially blamed his depression and relapse in September 2012 on a break-up with a girlfriend, and not the command of a voice. Notably, Block testified that defendant withheld any mention of a girlfriend whatsoever when he talked to her. She thought that this omission was highly indicative that months after the incident with charges pending, defendant was now fabricating a story. Nothing in the records that defendant sought to admit diminishes this very damaging aspect.

Moreover, only a tiny fraction of the over 400 pages of records sought to be introduced actually referenced hallucinations of any kind. As previously discussed, those references happened over four years before October 2012, which diminishes their importance, and, contrary to the crux of defendant's argument, it is far from clear if they reference contemporaneous instances of hallucinations. Thus, Block's contention that "there is almost no mention of any kind of psychosis or hallucination in all of these records," would not reasonably have been impugned by the admission of the records themselves.

We also note that Rao testified that if she had been aware that defendant chose to drink on October 15, 2012, with no voices telling him to do so, then she would change her ultimate opinion. On that aspect, defendant testified at trial that he chose to drink on that date and that he

---

[4] Defendant had four sober years from 2008 until seeking treatment again in September 2012, resulting in no medical records during this time.

[5] In fact, the defense was allowed to recall Rao after Block testified. On recall, Rao never testified that these multiple references to hallucinations in the medical records pertained to different and distinct incidents of hallucinations. Instead, Rao was only able to confirm that the comments regarding hallucinations were made multiple times to different medical providers. Rao even conceded that in the instances when hallucinations were mentioned, defendant was not always diagnosed with psychosis.

did so voluntarily—the demon did not tell him to so do. As a result, defendant's insanity defense faced an uphill battle, given that his own expert arguably would have determined that he was not legally insane based on this aspect of defendant's testimony.

Therefore, we conclude that while defense counsel's failure to admit the records fell below an objective level of reasonableness, defendant cannot succeed on his claim of ineffective assistance because even if the records were admitted into evidence, there was not a reasonable probability that the jury would have reached a different result.

We note that this case is distinguishable from our Supreme Court's case in *Armstrong*. In *Armstrong*, the Supreme Court rejected this Court's reasoning that defense counsel's deficient performance did not prejudice the defendant because the defense was able to attack the prosecution witness's credibility through other means. *Armstrong*, 490 Mich at 291. As the Court noted, other credibility attacks "had less of a tendency to undermine the [witness's] credibility" than the admissible records that defense counsel failed to admit. *Id.* Here, though, the records defendant sought to admit did not state what defendant claims and did not have a tendency to undermine Block's credibility. Thus, at best, they were marginally helpful, and when viewed in their totality, they would not have assisted defendant. In other words, they do not show how Block was incorrect in her assessments. And, as discussed, the biggest problem defendant had was his own words *in those very records*, where he repeatedly denied having any hallucinations, especially in the records immediately before and after the October 2012 incident.

## II. CLOSING ARGUMENT

On appeal, defendant first asserts that the prosecution denied him a fair trial by impugning the integrity of his expert witness, Priya Rao. Generally, claims of prosecutorial misconduct are reviewed de novo. *People v Ackerman*, 257 Mich App 434, 448; 669 NW2d 818 (2003). The test is whether a defendant was denied a fair and impartial trial due to the actions of the prosecutor. *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2002). However, unpreserved claims are reviewed for plain error affecting defendant's substantial rights. *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). In the context of an unpreserved claim of prosecutorial misconduct, this means that reversal is only necessary if a timely instruction would have been inadequate to cure any defect. *Ackerman*, 257 Mich App at 449.

Defendant asserts that the prosecutor engaged in misconduct in several instances during closing argument. First, defendant claims that the prosecutor misstated Rao's rate of compensation and "embellished" to make it sound like Rao was reluctant to disclose her compensation. Our review of the record confirms that Rao testified that she was paid $125 per hour, but the prosecutor stated that Rao made $150 per hour. Defendant also takes exception to the prosecutor characterizing Rao as not "want[ing] to answer my question" related to her compensation. Our review of the cold record does not support the prosecutor's comment. The prosecutor's cross-examination of Rao on this topic went as follows:

> *Q*. So you were hired by the defense to come and testify[,] correct?
>
> *A*. Yes.
>
> *Q*. OK. And how much are you paid to be here?

*A.* Ah, I'm paid by the hour at 125 an hour.

A prosecutor may not, in arguing to the jury, mischaracterize the evidence presented, *People v Watson*, 245 Mich App 572, 588; 629 NW2d 411 (2001); nor may a prosecutor argue from facts not in evidence, *People v Bahoda*, 448 Mich 261, 282; 531 NW2d 659 (1995). Thus, it is clear that the prosecutor impermissibly mischaracterized the evidence with respect to Rao's compensation.

Defendant next contends that the prosecutor impermissibly alleged that Rao misled the jury because that is what she was paid to do.[6] While a prosecutor may argue that an expert had a financial motive to testify, arguments that an expert intentionally misled the jury may amount to misconduct. *People v Unger*, 278 Mich App 210, 240-241; 749 NW2d 272 (2008). In a case that turns largely on conflicting expert testimony, such as this case, a prosecutor "must take special steps to avoid misconduct designed to impugn the integrity of the defendant's experts." *Id.* at 240. The prosecutor's statements to the jury went beyond any financial motive and instead were clearly designed to impugn Rao's professional integrity. Moreover, his comments are similar to those this Court held constituted improper conduct in *Unger*. See *id.* (ruling that the prosecutor's comments alleging that the defense expert "did what he was paid to do" and that the expert was hired to provide "[r]easonable doubt at reasonable prices" were impermissible). Accordingly, the prosecutor committed misconduct by impugning Rao's integrity in his closing argument.

However, as in *Unger*, "a timely objection and curative instruction would have been sufficient to alleviate any prejudicial effect of these inappropriate prosecutorial arguments." *Id.* at 241. Accordingly, defendant has not demonstrated plain error requiring reversal, and he is not entitled to a new trial on this basis.

Defendant also claims that he is entitled to a new trial based on defense counsel's ineffective assistance in failing to object to the prosecutor's comments. However, defendant cannot succeed on this claim because he cannot establish the necessary prejudice. In other words, defendant has not demonstrated that had trial counsel objected, there was a reasonable probability that the jury would have reached a different verdict. See *Lopez*, 305 Mich App at 694. An objection simply would have resulted in the trial court reminding the jury that the attorneys' comments were not evidence, but the trial court independently did provide this same instruction, and jurors are presumed to follow the trial court's instructions. *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). Therefore, defendant's related claim of ineffective assistance must fail.

III. SENTENCING—OFFENSE VARIABLE 19

Defendant next argues that the trial court erroneously scored offense variable (OV) 19 at 15 points. This Court reviews the factual determinations underlying a trial court's offense

---

[6] For example, the prosecutor alleged that Rao reached her conclusion only because that is what defendant was "looking for" and that she was "paid to come up with" that conclusion.

variable assessment for clear error; such determinations must be supported by a preponderance of the evidence. *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). Clear error is present when the reviewing court is left with a definite and firm conviction that an error occurred. *People v Fawaz*, 299 Mich App 55, 60; 829 NW2d 259 (2012).

OV 19 accounts for threats to the security of penal institutions or interference with the administration of justice. Fifteen points are properly assessed when "[t]he offender used force or the threat of force against another person or the property of another person to interfere with, attempt to interfere with, or that results in the interference with the administration of justice or the rendering of emergency services." MCL 777.49(b). Ten points are properly assessed if "[t]he offender otherwise interfered with or attempted to interfere with the administration of justice." MCL 777.49(c).

Defendant claims that because he never used force or threatened the use of force when he interfered with the administration of justice by fleeing and eluding police officers, an assessment of only 10 points is appropriate.

This Court has defined "force" in the context of OV 19 as "nothing more than the exertion of strength and physical power." *People v Passage*, 277 Mich App 175, 178-179; 743 NW2d 746 (2007), citing *Random House Webster's College Dictionary* (2001). Here, the record is void of any use or threat of force on defendant's behalf. Instead, the record reveals that, while defendant admittedly interfered with the administration of justice when he fled from police in his vehicle and then failed to exit the vehicle upon command after crashing it, this conduct did not demonstrate the use of force. When defendants have actually done more to evade, such as fleeing on foot after a car chase, OV 19 is still properly scored at 10 points. See, e.g., *People v Ratcliff*, 299 Mich App 625, 633; 831 NW2d 474 (2013), vacated in part on other grounds 495 Mich 876; 838 NW2d 687 (2013) (upholding scoring of 10 points for OV 19 where the defendant fled in a vehicle after an officer ordered him to "freeze" and continued fleeing on foot after the vehicle stopped); *People v Cook*, 254 Mich App 635, 637-638; 658 NW2d 184 (2003), overruled in part on other grounds *People v McGraw*, 484 Mich 120, 133 n 42; 771 NW2d 655 (2009) (OV 19 scored at 10 points where the defendant engaged in reckless driving while fleeing a pursuing officer and ran from the police after crashing into a house). Furthermore, there is no evidence that defendant threatened to use any force in resisting the officers' commands.

Accordingly, we conclude that the trial court clearly erred in assessing 15 points for OV 19. OV 19 being properly scored at 10 points brings defendant's OV total down to 45 points, which results in a different sentencing grid in the sentencing guidelines. This new grid lowers his minimum guidelines range from 14-to-29 months down to 12-to-24 months.[7] See MCL

---

[7] We note that contrary to defendant's assertion, this new cell is not an "intermediate sanction cell." Intermediate cells have an upper limit of the minimum sentence range of 18 months or less, MCL 769.34(4)(a), and the upper limit of defendant's new cell is 24 months. This cell, instead, is called a "straddle cell," which means that the trial court "may elect to sentence the defendant to a prison term with the minimum portion of the indeterminate sentence within the

777.66. Where a scoring error alters the appropriate guidelines range, resentencing is required. *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

We affirm defendant's convictions, but we remand for resentencing. We do not retain jurisdiction.

/s/ Pat M. Donofrio
/s/ Peter D. O'Connell
/s/ Amy Ronayne Krause

---

guidelines range or to impose an intermediate sanction, absent a departure." *People v Harper,* 479 Mich 599, 617; 739 NW2d 523 (2007), citing MCL 769.34(4)(c).