# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

DARNELL DESHAUN WILSON,

        Defendant-Appellant.

UNPUBLISHED
November 17, 2015

No. 321816
Wayne Circuit Court
LC No. 13-003780-FC

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

RONALD PARKER WILSON,

        Defendant-Appellant.

No. 322074
Wayne Circuit Court
LC No. 13-003780-FC

Before: SHAPIRO, P.J., and O'CONNELL and GLEICHER, JJ.

PER CURIAM.

Defendants are brothers who were charged with three counts of assault with intent to murder, MCL 750.83, and one count each of possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b, for shooting Demar Floyd and Nikinia Talley, and aiming a weapon at Marcellis Martin. Defendants pleaded self-defense, with Darnell Wilson claiming he brought a shotgun with him for protection when he drove to the rescue of his brother, Ronald Wilson, who had been violently assaulted. Ronald asserted that he took the shotgun out of Darnell's car and began shooting because the victims were threatening him. The jury accepted this defense to some degree, convicting Ronald of only two counts of the lesser included offense of assault with intent to do great bodily harm less than murder, MCL 750.84, and acquitting Darnell of all assault charges, but convicting both of felony-firearm.

Darnell raises a single claim of ineffective assistance of counsel based on an alleged instructional error, which lacks merit. Ronald challenges the sufficiency and weight of the evidence supporting his convictions, which also warrants no relief. However, Ronald has

-1-

established grounds to remand for a *Crosby*[1] hearing based on our Supreme Court's recent pronouncement regarding the scoring of the sentencing guidelines in *People v Lockridge*, ___ Mich ___; ___ NW2d ___ (Docket No. 149073, decided July 29, 2015), and the court's erroneous scoring of offense variable (OV) 14. Accordingly, we affirm both defendants' convictions in these consolidated appeals, but vacate Ronald's assault sentences and remand for further sentencing proceedings consistent with this opinion.

## I. BACKGROUND

On the evening of March 23, 2013, a group of friends, including defendant Ronald Wilson, hired a "party bus" to celebrate Demar Floyd's birthday. After several hours of drinking and revelry, the bus returned the group to Floyd's home in the early morning hours of March 24. The parties disagree regarding the events that followed. Floyd and his wife Deandra, Nikinia Talley, and Marcellis Martin testified that Ronald engaged in two separate fistfights with other party guests. They claimed that Ronald also became belligerent when the group travelled to a restaurant for breakfast, causing them to be ejected. Ronald testified that a group of six to seven people twice beat him to the point of unconsciousness. He admitted having a verbal altercation with Martin at the restaurant, however.

It is undisputed that following his fights, Ronald telephoned his brother Darnell to ask for assistance. Darnell testified that he could hear threatening voices in the background and he feared for Ronald's safety. As a result, Darnell placed his shotgun in the backseat for protection before he drove to pick up Ronald. At trial, Ronald and Darnell testified that Ronald reached inside the car and took the shotgun upon Darnell's arrival. Some of the witnesses claimed that Darnell handed Ronald the gun. Regardless, Ronald fired several shots, striking Talley in the right shoulder and Floyd in the abdomen. Investigating officers found six spent shotgun shells in the street.

## II. DARNELL WILSON'S APPEAL-INEFFECTIVE ASSISTANCE OF COUNSEL

In Docket No. 321816, Darnell asserts that his trial counsel should have requested a jury instruction regarding the Detroit Police Department's failure to record his statement. Specifically, officers arrested defendants on April 1, 2013. Three days earlier, a new law took effect—MCL 763.8. According to MCL 763.8(2),

> A law enforcement official interrogating an individual in custodial detention regarding the individual's involvement in the commission of a major felony shall make a time-stamped, audiovisual recording of the entire interrogation. A major felony recording shall include the law enforcement official's notification to the individual of the individual's *Miranda* rights.

---

[1] *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

Darnell complains that the officer who interrogated him following his arrest violated this provision by failing to record the interaction. The remedy for this violation was a special jury instruction, Darnell continues, pursuant to MCL 763.9:

Any failure to record a statement as required under [MCL 763.8] or to preserve a recorded statement does not prevent any law enforcement official present during the taking of the statement from testifying in court as to the circumstances and content of the individual's statement if the court determines that the statement is otherwise admissible. However, unless the individual objected to having the interrogation recorded and that objection was properly documented under [MCL 763.8(3)], the jury shall be instructed that it is the law of this state to record statements of an individual in custodial detention who is under interrogation for a major felony and that the jury may consider the absence of a recording in evaluating the evidence relating to the individual's statement.

Counsel was ineffective for failing to request this instruction in Darnell's estimation because the content of his statement to the police was hotly contested at trial.

Darnell failed to preserve his challenge by filing a motion for a new trial or a *Ginther*[2] hearing in the lower court. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). Our review is therefore limited to plain error apparent on the existing record. *Id.*

" '[T]he right to counsel is the right to the effective assistance of counsel.' " *United States v Cronic*, 466 US 648, 654; 104 S Ct 2039; 80 L Ed 2d 657 (1984), quoting *McMann v Richardson*, 397 US 759, 771 n 14; 90 S Ct 1441; 25 L Ed 2d 763 (1970). An ineffective assistance claim includes two components: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish the deficiency component, a defendant must show that counsel's performance fell below "an objective standard of reasonableness" under "prevailing professional norms." *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). With respect to the prejudice aspect, the defendant must demonstrate a reasonable probability that but for counsel's errors, the result of the proceedings would have been different. *Id.* at 663-664. The defendant also must overcome the strong presumptions that "counsel's conduct [fell] within the wide range of reasonable professional assistance" and that counsel's actions were sound trial strategy. *Strickland*, 466 US at 689. [*People v Galloway*, 307 Mich App 151, 157-158; 858 NW2d 520 (2014).]

Darnell's claim must fail because other statutory provisions enacted along with MCL 763.8 and MCL 763.9 essentially granted law enforcement agencies a grace period to begin recording suspect interviews. MCL 763.10 states that the recording requirement is "a directive

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

-3-

to departments and law enforcement officials and not a right conferred on an individual who is interrogated." MCL 763.11(1) then grants the "commission on law enforcement standards" 120 days after the statutes' effective date to "conduct an assessment of the initial cost necessary for law enforcement agencies to purchase audiovisual recording equipment." Law enforcement agencies were permitted 120 days after receiving their funding before compliance would be required. MCL 763.11(3). And the Legislature granted an additional 60 days to begin procedures in compliance with the act:

> [A] law enforcement agency shall comply with the provisions of the amendatory act that added this subsection within 60 days after the date the commission adopts the standards for audiovisual recording equipment required by this section if the law enforcement agency has audiovisual recording equipment that complies with those standards on that date, or within 60 days after the date the law enforcement agency subsequently obtains audiovisual recording equipment that complies with the adopted standards. [MCL 763.11(4).]

Although Darnell is correct that the cited statutory scheme became effective before his arrest and interrogation on April 1, 2013, he fails to recognize the prospective nature of the imposed requirements and the time frame delineated in MCL 763.11 for police departments to attain compliance. See *People v Conyer*, 281 Mich App 526, 529; 762 NW2d 198 (2008) ("[A] statute is presumed to operate prospectively unless [a] contrary intent is clearly manifested."). Darnell provides no evidence to suggest that the commission had enacted its standards for audiovisual equipment and funded the Detroit Police Department's need for such equipment, or that the police department had actually installed the code-compliant equipment in the three-day gap. Accordingly, there was no reasonable basis for defense counsel to argue that the police were required to comply with MCL 763.8 and therefore to request an instruction consistent with MCL 763.9. And "[i]t is well established that defense counsel is not ineffective for failing to pursue a futile motion." *People v Brown*, 279 Mich App 116, 142; 755 NW2d 664 (2008). Accordingly, Darnell is not entitled to relief.

### III. RONALD WILSON'S APPEAL

In Docket No. 322074, Ronald contends that his convictions were based on insufficient evidence and were against the great weight of the evidence in light of his claim of self-defense. He further asserts that the circuit court erred in finding that he was a leader in a multiple-offender situation and thereby scoring OV 14 at 10 points.

### A. EVIDENTIARY SUPPORT FOR CONVICTIONS

We review de novo challenges to the sufficiency of the evidence. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001).

> [W]hen determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt.

[*People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), mod 441 Mich 1201 (1992).]

Although no special action is needed to preserve a challenge to the sufficiency of the evidence, *Hawkins*, 245 Mich App at 457, a defendant must make a timely motion for a new trial to preserve a claim that a verdict is contrary to the great weight of the evidence. MCR 2.611(A)(1)(e). Ronald failed to raise this issue until his motion to remand filed in this Court. As this Court denied that motion[3] and no hearing was conducted, our review is limited to plain error affecting Ronald's substantial rights. See *People v Lopez*, 305 Mich App 686, 695; 854 NW2d 205 (2014). As a general rule, however:

> The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand. Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence. Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial. Further, the resolution of credibility questions is within the exclusive province of the jury. [*People v Lacalamita*, 286 Mich App 467, 469-470; 780 NW2d 311 (2009) (quotation marks and citations omitted).]

To support Ronald's convictions for the two counts of assault with intent to do great bodily harm less than murder, the prosecution had to establish beyond a reasonable doubt: "(1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm less than murder." *People v Stevens*, 306 Mich App 620, 628; 858 NW2d 98 (2014). To establish felony-firearm, the prosecution had to establish that Ronald possessed a firearm at the same time. See *People v Avant*, 235 Mich App 499, 505; 597 NW2d 864 (1999).

Ronald admits that he possessed a firearm and that he shot it toward the victims. He asserts, however, that he took this action in self-defense.

> AWIGBH is a specific intent crime. The intent to do great bodily harm less than murder is an intent to do serious injury of an aggravated nature. If a defendant has such intent, the fact that he was provoked or that he acted in the heat of passion is irrelevant to a conviction. Because of the difficulty in proving an actor's intent, only minimal circumstantial evidence is necessary to show that a defendant had the requisite intent. Intent to cause serious harm can be inferred from the defendant's actions, including the use of a dangerous weapon or the making of threats. Although actual injury to the victim is not an element of the crime injuries suffered by the victim may also be indicative of a defendant's

---

[3] *People v Wilson*, unpublished order of the Court of Appeals, entered April 29, 2015 (Docket No. 322074).

intent[.] [*Stevens*, 306 Mich App at 628-629 (quotation marks and citations omitted).]

"Once a defendant raises the issue of self-defense and 'satisfies the initial burden of producing some evidence from which a jury could conclude that the elements necessary to establish a prima facie defense of self-defense exist,' the prosecution must 'exclude the possibility' of self-defense beyond a reasonable doubt." *Id.* at 630, quoting *People v Dupree*, 486 Mich 693, 709-710; 788 NW2d 399 (2010). In accordance with MCL 780.972(1):

> An individual who has not or is not engaged in the commission of a crime at the time he or she uses deadly force may use deadly force against another individual anywhere he or she has the legal right to be with no duty to retreat if . . . .

> (a) The individual honestly and reasonably believes that the use of deadly force is necessary to prevent the imminent death of or imminent great bodily harm to himself or herself or to another individual.

Here, there was conflicting evidence whether Ronald acted in self-defense such that the specific intent to commit assault with intent to do great bodily harm could be negated. The Floyds, Talley, and Martin testified that hard feelings arose on the party bus when Ronald grabbed Talley's inner thigh without her consent. Another party goer had to intervene to protect Talley. Once the group had returned to the Floyds' home, these witnesses testified that Ronald engaged in two fistfights, each a one-on-one battle with another party guest. The victims denied that they were involved in those fights and claimed to have assisted Ronald afterward. These witnesses further indicated that the group travelled to a restaurant after the fights and that Ronald acted aggressively toward their waitress, causing them to be ejected. Ronald drove back to the Floyds' neighborhood with Talley and became so hostile that she asked him to leave her car. Ronald rode the rest of the way with the Floyds. When the group returned to the neighborhood, Ronald telephoned his brother. The witnesses claimed that Ronald was angry during the conversation and complained to his brother about the treatment he received at the hands of his friends. Talley explained that when Darnell drove up, she was frightened and therefore grabbed a baseball bat for protection. The witnesses heard Darnell query "Who did this to you?" and "What do you want to do?" before handing Ronald the shotgun. The prosecution witnesses asserted that no one tried to block Ronald's retreat in Darnell's vehicle and he could have simply left the scene.

Ronald, on the other hand, denied that he touched Talley on the party bus. He described a different timeline of events than the prosecution witnesses. Ronald claimed that the party went to breakfast before he was attacked. He acknowledged, however, that he had a disagreement with the others at the restaurant. The hostility that led to his assault by a mob of six to seven people therefore stemmed from the restaurant incident, Ronald implied. The men beat Ronald until he lost consciousness. When Ronald awoke, another group of men, including Floyd, assaulted him again, this time using objects to beat him into unconsciousness. Ronald claimed that he was covered in cuts, bruises and blood when he again revived. He tried to escape to a neighbor's house, but when no one answered the door, he telephoned Darnell for help. When Darnell arrived, Ronald alleged that Floyd was standing near him and Ronald felt threatened. As a result, he grabbed the shotgun in Darnell's backseat and fired in self-defense.

-6-

Darnell corroborated Ronald's version of events. He asserted that when Ronald telephoned him, he heard angry voices and swearing in the background, leaving him with the impression that Ronald was in danger. Darnell therefore brought his shotgun for protection when he drove to pick up Ronald. When he pulled up, Darnell observed individuals yelling and pointing at Ronald. He also saw that Ronald was badly injured and limping. Darnell admitted that he pulled his vehicle between Ronald and the others as a shield. When he questioned Ronald about the events leading to his injuries, Ronald accused "all of them" of attacking him, and showed that his pockets were empty, implying that he was robbed. Darnell described Floyd as taking a fighting stance at that point and that Talley ran out of the house screaming and swinging a baseball bat and nearly struck him. It was only at that point, according to Darnell, that Ronald took the shotgun from the backseat and began firing.

From this evidence the jury could have concluded that Ronald acted in self-defense. The jury also could have determined that Darnell was obliged to safely retreat to Ronald's car and that his failure to do so negated his self-defense claim. Or the jury could have discerned from the evidence that the victims were not threatening Ronald and he had no need to resort to any type of violence. Although there were some discrepancies in the testimony adduced at trial, credibility determinations are within the sole purview of the jury. See *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). It is well-established that "[t]his Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *Id.* The jury resolved the credibility contest in this case and we may not interfere to award Ronald a new trial.

## B. SENTENCING GUIDELINES

Ronald also challenges the circuit court's decision to score OV 14 at 10 points upon the prosecutor's request at the sentencing hearing. MCL 777.44 governs the scoring of OV 14 as follows:

(1) [OV] 14 is the offender's role. Score [OV] 14 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

    (a) The offender was a leader in a multiple offender situation.......... 10 points

    (b) The offender was not a leader in a multiple offender situation........ 0 points

(2) All of the following apply to scoring [OV] 14:

    (a) The entire criminal transaction should be considered when scoring this variable.

    (b) If 3 or more offenders were involved, more than 1 offender may be determined to have been a leader.

Ronald contends that the facts do not support the score and that following *Lockridge*, the court could not rely upon facts that were not found by the jury in assessing this score.

In *Lockridge*, the Supreme Court held: "we conclude that although the guidelines can no longer be mandatory, they remain a highly relevant consideration in a trial court's exercise of sentencing discretion. Thus, we hold that trial courts 'must consult those Guidelines and take them into account when sentencing.' " *Lockridge*, slip op at 28, quoting *United States v Booker*, 543 US 220, 264; 125 S Ct 738; 160 L Ed 2d 621 (2005). In doing so, the sentencing court must assess the highest possible points for each applicable OV "whether using judge-found facts or not." *Id.* at 29 n 28. The effect of *Lockridge* is to make the sentencing guidelines advisory only. *Id.* at 28. Accordingly, once the guidelines are correctly scored using the highest number of points allowable for each variable, the court then has discretion to impose a sentence within the range or without.

In *Lockridge*, the Supreme Court determined that a defendant's challenge is unpreserved if he does not raise an objection to the scoring of his OVs in the trial court based on *Apprendi v New Jersey*, 530 US 466; 120 S Ct 2348; 147 L Ed 2d 435 (2000), and *Alleyne v United States*, 570 US __; 133 S Ct 2151; 186 L Ed 2d 314 (2013). *Lockridge*, slip op at 30. Ronald did not raise any such challenge below and our review is therefore limited to plain error affecting his substantial rights. *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). The Supreme Court continued in *Lockridge*, slip op at 32, by describing how plain error may be established in future cases:

> First, we consider cases in which (1) facts admitted by the defendant and (2) facts found by the jury were sufficient to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced. In those cases, because the defendant suffered no prejudice from any error, there is no plain error and no further inquiry is required.

> Second, we consider the converse: cases in which facts admitted by a defendant or found by the jury verdict were insufficient to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced. In those cases, it is clear from our previous analysis that an unconstitutional constraint actually impaired the defendant's Sixth Amendment right. The question then turns to which of these defendants is entitled to relief, i.e. which can show plain error.

> We conclude that all defendants (1) who can demonstrate that their guidelines minimum sentence range was actually constrained by the violation of the Sixth Amendment and (2) whose sentences were not subject to an upward departure can establish a threshold showing of the potential for plain error sufficient to warrant a remand to the trial court for further inquiry. We reach this conclusion in part on the basis of our agreement with the following analysis from [*Crosby*, 397 F3d at 117-118]:

>> Some might suppose that the only choice for an appellate court in a case presenting a procedural error in imposing a sentence is between disregarding the error and requiring a new sentencing. However, the choice is not so limited. . . . . Bearing in mind the several considerations outlined

-8-

above that shape the context in which a disposition decision is to be made, we conclude that the "further sentencing proceedings" generally appropriate for pre-*Booker* . . . sentences pending on direct review will be a remand to the district court, not for the purpose of a required resentencing, *but only for the more limited purpose of permitting the sentencing judge to determine whether to resentence, now fully informed of the new sentencing regime, and if so, to resentence. . . .*

A remand for determination of whether to resentence is appropriate in order to undertake a proper application of the plain error and harmless error doctrines. Without knowing whether a sentencing judge would have imposed a materially different sentence, . . . an appellate court will normally be unable to assess the significance of any error that might have been made. . . .

Obviously, any of the errors in the procedure for selecting the original sentence discussed in this opinion would be harmless, and not prejudicial under plain error analysis, if the judge decides on remand, in full compliance with now applicable requirements, that under the post-*Booker* . . . regime the sentence would have been essentially the same as originally imposed. Conversely, a district judge's decision that the original sentence would have differed in a nontrivial manner from that imposed will demonstrate that the error in imposing the original sentence was harmful and satisfies plain error analysis.

*In short, a sentence imposed under a mistaken perception of the requirements of law will satisfy plain error analysis if the sentence imposed under a correct understanding would have been materially different. . . .*

Thus, in accordance with this analysis, in cases in which a defendant's minimum sentence was established by application of the sentencing guidelines in a manner that violated the Sixth Amendment, the case should be remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error. If the trial court determines that the answer to that question is yes, the court shall order resentencing. *Id.* at 118. [*Lockridge*, slip op at 32-34 (emphasis in original, some alterations in original).]

Absent the scoring of OV 14, Ronald's total OV Level would be reduced from IV to III. And the facts necessary to support the score were certainly found by the judge, not the jury. Neither Ronald's assault nor his felony-firearm convictions included an element of leadership in a multiple-offender situation. Accordingly, whether the circuit court violated Ronald's Sixth Amendment rights by scoring OV 14 based on judge-found facts, or instead erred in finding the facts necessary to score OV 14 in the first place, Ronald is entitled to a hearing for the court to reconsider its sentencing decision. *Id.* at 32-33.

We now review the factual support for the lower court's finding in this regard. Nothing in *Lockridge* alters the legal requirement that a judge's factual findings at a sentencing hearing

be supported by a preponderance of the evidence. See *People v Stokes*, ___ Mich App ___; ___ NW2d ___ (Docket No. 321303, issued September 8, 2015), slip op at 6, citing *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). We review the court's factual determinations for clear error. *Hardy*, 494 Mich at 438.

The events at issue undoubtedly amounted to a multiple-offender situation. Ronald and Darnell, acting together, were squared off against the victims. See *People v Jones*, 299 Mich App 284, 287; 829 NW2d 350 (2013), vacated on other grounds 494 Mich 880 (2013) ("[T]he plain meaning of 'multiple offender situation' as used in OV 14 is a situation consisting of more than one person violating the law while part of a group."). The question remains whether Ronald could be considered the "leader" in this situation. To the extent that this determination requires us to consider the lower court's interpretation and application of MCL 777.44, our review is de novo. *Id.*

For purposes of OV 14, "a 'leader' is defined in relevant part as 'a person or thing that leads' or 'a guiding or directing head, as of an army or political group.' To 'lead' is defined in relevant part as, in general, guiding, preceding, showing the way, directing, or conducting." *People v Rhodes*, 305 Mich App 85, 90; 849 NW2d 417 (2014). We agree with Ronald that there is no evidence that he acted as a leader under the circumstances. Darnell made the decision to bring a shotgun to the scene without instruction from or consultation with his brother. There is conflicting testimony regarding how the weapon found its way into Ronald's hands. The prosecution witnesses testified that Darnell handed Ronald the weapon. Darnell and Ronald testified that Ronald took the weapon from the backseat. No prosecution witness heard Ronald ask for the weapon or order Darnell to hand it to him. There simply is no evidence that Ronald directed Darnell to engage in any particular action other than to request to be picked up. At best, the evidence suggests a concert of action between the brothers. Although Ronald's actions were more aggressive, this does not necessarily translate into evidence that he acted as the leader.

The rescoring of OV 14 to zero will alter the guidelines range. Ronald's total PRV score was 15 points. With the alteration of Ronald's OV 14 score, his total OV score would be reduced from 75 to 65 points. While the original advisory sentencing range was 29 to 57 months, the scoring change results in an advisory range of 19 to 38 months. Accordingly, during resentencing, the court must not score OV 14 and then determine Ronald's appropriate sentence.

We affirm the convictions of both defendants, but vacate Ronald Wilson's sentences in Docket No. 322074 and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Douglas B. Shapiro
/s/ Peter D. O'Connell
/s/ Elizabeth L. Gleicher

-10-