*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ANTHONY FRANCIS WILSON,

Defendant-Appellant.

UNPUBLISHED
January 19, 2023

No. 356825
Emmet Circuit Court
LC No. 20-005093-FC

Before: GLEICHER, C.J., and K. F. KELLY and LETICA, JJ.

PER CURIAM.

A jury convicted Anthony Francis Wilson of two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(2)(b), for sexually assaulting his girlfriend's six-year-old daughter. In a motion for a new trial, Wilson challenged his trial counsel's performance, the trial prosecutor's conduct, the admissibility of expert testimony regarding characteristics of child sexual abuse victims and an aspect his ex-girlfriend's testimony and contended that COVID-19 masking requirements violated his rights. Although defense counsel provided constitutionally ineffective assistance, there is no reasonable probability that his errors affected the outcome of the trial. And the remainder of Wilson's challenges are without merit. We affirm.

## I. BACKGROUND

Wilson dated RH from approximately 2007 through 2011. RH's daughter, AB, was six years old when the relationship began. Approximately 10 years later, AB revealed to her mother that Wilson had sexually assaulted her on one occasion when RH left AB in Wilson's care overnight. At trial, then 17-year-old AB testified that she was alone and attempting to fall asleep on the bottom bunk of a bunk bed at Wilson's apartment. Wilson entered the room and instructed AB to lay on her back. AB recalled that Wilson pulled down her pants and kneeled over her. He then slid "his flaccid penis through the folds of AB's vagina, like a hot dog in a hot dog bun" until it became erect. Wilson then inserted his penis into AB's vagina. AB remembered feeling pain and saying, "Ow." Wilson stopped, placed his penis back into his pants, and left the room.

AB did not report the assault at the time because she did not understand what had happened. She also did not report the incident immediately after realizing it was a sexual assault. AB testified

-1-

that she "did not want to be traumatized by the system," did not know if anyone would believe her, and was concerned that her father would blame her mother for allowing the assault to happen. AB struggled with depression, anxiety, and behavioral and anger management issues for years, for which her parents secured counseling. AB did not report Wilson's assault to her counselor because she was afraid the counselor would tell her parents. During an argument with her mother in March 2020, AB finally broke down and told her of the assault. RH contacted AB's father and the family reported the assault to the police.

At trial, RH supported AB's description of the assault by testifying that while they were dating, Wilson had difficulty reaching erection if he had been drinking. On those occasions, Wilson would rub his penis against her vagina to reach erection in the same manner described by AB.

The prosecution also presented the testimony of Thomas Cottrell, an expert in the field of child sexual abuse. Cottrell had never met AB, had not read the police report detailing the assault, and maintained that he could not testify whether Wilson sexually assaulted AB; his testimony was more general in nature. Cottrell described that children who delay disclosure of sexual abuse fall into three categories: (1) those who do not understand what has happened to them, (2) those who are so terrified or traumatized that they cannot "generate the words to talk about it," and (3) those who "use their own cost/benefit analysis" and determine that the risks or consequences of disclosing sexual abuse are greater than the benefits. The costs of disclosure from a child's point of view may include rejection by loved ones or upsetting his or her caregivers. These children are "perpetually considering" whether it is safer to disclose their past abuse or keep it a secret. Cottrell further testified that children who initially do not understand what occurred may continue to hide the assault after realizing its import because they are traumatized or because they deem the costs of disclosure to be too high. Cottrell testified that "it is not at all atypical for children to wait until adulthood in order to disclose abuse for the very first time." Cottrell also stated that a child may disclose sexual abuse during a heated discussion or an argument with a parent because "[c]hildren tend to drop their barriers" during these interactions. In addition, he opined that the way in which a child recounts sexual abuse "is very dependent on the child, based on their comfort level."

After one question from Wilson's trial counsel, Robert Mendham, Cottrell answered questions submitted by the jury. The court posed the first question from the jury to Cottrell as follows:

> *Q.* Sir, one of the jurors asked, would there be any perceived or legitimate reward for children to make allegations of this kind if they are not true?

> * * *

> *A.* I could certainly envision that potentially, I know, as an example, we've had one family here where there were false allegations made on the part of the teen, and her agenda was to get the assailant, who was also a domestic violence assailant towards her mother, out of the home.

The mother was not acting to protect herself, so the child made an allegation of sexual abuse in order to protect the mother, so that wouldn't be a gain in this case that a child would get from falsely disclosing.

*I would not say it's impossible to have a gain for a false allegation.* I can tell you in my years of experience, it is an extremely rare occurrence. [Emphasis added.]

Cottrell then testified in response to further jury questions that it was typical for a child to be unable to recall the specific events related to the abuse because memories degrade over time. Finally, Cottrell stated that after a child is abused, that child may exhibit many changes in behavior, including changes in hygiene, substance abuse, night terrors, and depression.

The jury convicted Wilson as charged and the court sentenced him to concurrent terms of 25 to 40 years' imprisonment. Wilson filed a motion for new trial raising the same claims he cites on appeal, including that his counsel was ineffective for failing to object to Cottrell's testimony regarding "gain," [1] and RH's testimony about Wilson's sexual conduct. The court conducted a hearing pursuant to *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), and heard testimony from Mendham regarding his trial preparation and strategy. Mendham admitted that he had not researched whether expert testimony about delayed reporting of child sexual abuse amounted to improper vouching for the witness. Indeed, had Mendham conducted a simple search of Cottrell's name, these cases would have been apparent. However, Mendham indicated that he did not object to RH's description of Wilson's sexual habits as he believed the testimony to be admissible.

The court rejected all of Wilson's challenged errors but one—that Mendham should have objected during Cottrell's testimony. The court agreed that Mendham's trial preparation was "concerning" and found that his lack of familiarity with relevant caselaw "fell below an objective standard of reasonableness for an attorney representing a client under these circumstances." But the failure to object was harmless, in the court's estimation, as Cottrell's testimony was not actually improper and given the strength of AB's testimony against Wilson. Accordingly, the court denied Wilson's request for a new trial.

Wilson appeals.

## II. VOUCHING FOR THE COMPLAINANT

Wilson contends that the court improperly permitted Cottrell to bolster AB's credibility by testifying that it would be an "extremely rare occurrence" for a child "to have a gain" for a false allegation of sexual abuse. Wilson failed to preserve this challenge through contemporaneous objection, *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019), limiting our review to

---

[1] Wilson mischaracterized Cottrell's testimony in his motion and continues to do so on appeal. Cottrell did not testify that it would be an "extremely rare occurrence" for a child to make a false allegation of sexual abuse, but rather that it would be an "extremely rare occurrence" for a child to gain from a false allegation of sexual abuse.

-3-

plain error affecting Wilson's substantial rights. *People v Burkett*, 337 Mich App 631, 643-644; 976 NW2d 864 (2021).

MRE 702 permits litigants to present expert testimony at trial to assist the jury in understanding the evidence. In a CSC trial, "(1) an expert may not testify that the sexual abuse occurred, (2) an expert may not vouch for the veracity of a victim, and (3) an expert may not testify whether the defendant is guilty." *People v Peterson*, 450 Mich 349, 352; 537 NW2d 857 (1995). "An expert may testify regarding typical symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim or to rebut an attack on the victim's credibility." *Id*. at 373 (emphasis omitted). However, a statistical assessment indicating that children almost never lie about abuse constitutes improper vouching for the victim. *Thorpe*, 504 Mich at 259-260.

The issue in *Thorpe* was whether Cottrell improperly vouched for the complainant's credibility when he testified "that only 2% to 4% of children lie about sexual abuse" and identified two scenarios in which children "might lie"—when the child's sibling has been sexually abused or when there is other domestic violence in the home. *Id*. at 239-240, 259. Neither of those scenarios existed in *Thorpe*. The Supreme Court concluded, "although he did not actually say it, one might reasonably conclude on the basis of Cottrell's testimony that there was a 0% chance [the victim] had lied about sexual abuse. In so doing, Cottrell for all intents and purposes vouched for [the complainant's] credibility." *Id*.

In the consolidated matter of *People v Harbison*, the Supreme Court found prejudicial error where the medical doctor who examined the complainant testified that she diagnosed the child with "probable pediatric sexual abuse." *Id*. at 243-244, 260-261. The Supreme Court noted that "an examining physician cannot give an opinion on whether a complainant had been sexually assaulted if the conclusion is nothing more than the doctor's opinion that the victim had told the truth." *Id*. at 262 (cleaned up).

Following *Thorpe*, this Court again considered whether Cottrell had improperly vouched for the credibility of a child sexual abuse complainant in *People v Ruiz*, unpublished per curiam opinion of the Court of Appeals, issued December 21, 2021 (Docket No. 352431). In that case, Cottrell testified that false disclosures of sexual assault "rarely" happen, but do occur. *Id*. at 3. This Court reasoned that "[t]he differences between Cottrell's statements in *Thorpe* and in this case are significant and should not be overlooked." *Id*. at 5. Specifically, use of the word "rarely" to indicate the frequency with which false allegations are made is "far less precise" than the percentages used in *Thorpe*. *Id*. This Court stated that Cottrell also "provided a concrete indicator of false disclosure that was relevant to this case" when he stated that it would be a "red flag" for a victim to repeat the same allegation "word-for-word." *Id*. at 3, 5. This Court stated that "Cottrell's remark was vague, isolated, and never mentioned again" and therefore ultimately harmless. *Id*. at 6.

The language employed in this case is much more similar to *Ruiz* than *Thorpe* or *Harbison*. Indeed, Cottrell did not comment on the frequency with which complainants falsely report child sexual abuse in any manner. Rather, Cottrell testified that child sexual abuse victims rarely have a gain from making a false report. Accordingly, the case for affirmance is even stronger here than in *Ruiz*. We further note that Cottrell's allegedly objectionable testimony was provided in response

to a juror's question, and was not elicited by the prosecution like in *Ruiz*, *Thorpe*, and *Harbison*. The prosecutor did not attempt to elicit testimony that AB was truthful and Cottrell did not vouch for AB's credibility.

### III. OTHER-ACTS EVIDENCE

Wilson further contends that the trial court improperly admitted testimony from RH describing that Wilson would rub his flaccid penis against her vagina to cause an erection. Wilson characterizes this testimony as improper other-acts evidence. As Wilson failed to raise a contemporaneous objection to the admission of this evidence, our review is again limited to plain error affecting Wilson's substantial rights.

Under the rules of evidence, relevant evidence (that is evidence with "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence") is admissible unless otherwise excluded "by the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court." MRE 401; MRE 402. RH's testimony was certainly relevant. However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403. Here, the evidence was prejudicial only because it was powerful, and not because it was in any sense unfair.

Wilson cites MRE 404(b)(1) to support that RH's testimony was inadmissible despite its relevance. MRE 404(b)(1) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

MRE 404(b)(1) prohibits the introduction of character evidence offered to prove conduct in conformity therewith. A MRE 404(b) analysis focuses on whether the challenged evidence supplies a *non*-character inference both probative of and material to an issue of consequence in the case, such as motive or opportunity.

Wilson's "act" of rubbing his penis against RH is not indicative of a character trait and MRE 404(b)(1) does not apply to limit its admissibility. Even when examined through a 404(b)(1) lens, however, the evidence passes muster. Wilson's sexual technique for gaining an erection establishes an inference of a "system in doing an act." MRE 404(b)(1). That Wilson used a specific method for gaining an erection when intoxicated made it more probable that he employed the same system when sexually abusing AB. RH's testimony was therefore admissible.

Wilson complains that he did not receive the 14-day notice required by MRE 404(b)(2) before the prosecutor presented other-act evidence at trial. As RH's testimony did not fall within

the parameters of MRE 404(b)(1), the prosecution was not required to comply with the notice requirement of subsection (b)(2). In any event, defense counsel was not taken by surprise as RH's statement was included in discovery materials.

Wilson further challenges the prosecution's use of this "propensity evidence" in closing argument without any limiting instruction being provided by the court. Wilson mischaracterizes the prosecutor's argument. The prosecutor did not make an improper character inference. Rather, the prosecution's argument demonstrated that AB had age-inappropriate knowledge of Wilson's sexual habits. The prosecution used this admissible evidence to argue that Wilson was the individual who assaulted AB.

## IV. PROSECUTORIAL MISCONDUCT

Wilson contends that he is entitled to a new trial because the prosecutor improperly used inadmissible evidence to vouch for AB's credibility during closing argument. Specifically, the prosecutor argued:

> [T]he Judge . . . at the end of this trial – he's going to tell you that it may be helpful to think about whether the witnesses you've heard from have any special reason to tell the truth, or any special reason to lie; and [AB] has absolutely no reason to lie about this; no reason whatsoever to fabricate this. She gains nothing by lying about this. All she's gotten after disclosing this is being put in a bunch of stressful, anxiety-inducing situations.
>
> I think it was a question from one of the jurors to Mr. Cottrell, where he talked about – you know, he's seen hundreds if not thousands of child victims of sexual abuse, and he said, you know, the one situation he can think of where a false accusation was made, it was because the girl wanted to get the guy out of the house who was beating her mother.
>
> Kids lie to get out of trouble, right; not into trouble. They lie to get out of trouble; not into situations that cause them pain and discomfort.
>
> In the situation Mr. Cottrell talked about, that kid was lying to get away from trouble; to get away from this guy who was beating on her mother. That's not this case, right? [Wilson] had been out of [AB's] life for a decade, for years. he hadn't had any interaction with [AB] or her family. He wasn't talked about. His name wasn't mentioned around the house.

Again, as Wilson failed to raise a contemporaneous objection in the trial court, our review is limited to plain error affecting Wilson's substantial rights. "The test of prosecutorial misconduct is whether the defendant was denied a fair and impartial trial." *People v Brown*, 279 Mich App 116, 134; 755 NW2d 664 (2008). In reviewing a challenge to a prosecutor's remarks, we must consider the record as a whole and be cognizant of the context in which the statements were made. *People v Callon*, 256 Mich App 312, 330; 662 NW2d 513 (2003). Relevant to the issue before us, "a prosecutor may not vouch for the credibility of his witnesses by implying that he has some special knowledge of their truthfulness," but "may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the

defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004).

Wilson argues that the prosecution improperly argued that AB had nothing to gain from fabricating allegations against him and vouched for AB's credibility by highlighting Cottrell's testimony that children do not lie "to get into situations that cause them pain and discomfort."

AB testified that she waited to report the sexual assault because she was afraid no one would believe her, her mother would be distressed, and her father would blame her mother. Because AB did not report the assault until approximately 10 years after it occurred and long after Wilson and her mother broke up, a juror could reasonably infer that AB would receive no gain from falsely accusing Wilson. Cottrell's expert testimony offered professional insight into the reasons that children are reluctant to disclose sexual abuse. The prosecutor's argument connected Cottrell's testimony to AB's. This was not improper vouching.

The prosecutor did mischaracterize Cottrell's testimony to an extent by arguing that he had testified that children lie to "get out of trouble . . . not into trouble." Cottrell did not testify regarding children's general propensity for truthfulness. Any error in this regard was cured by the court's jury instructions that "you may only use the evidence that was properly admitted in this case" and that the evidence included sworn testimony of witnesses at trial, but not the lawyers' statements and arguments. Because jurors are presumed to follow their instructions and the prosecution's statements regarding AB's potential gains for false allegations could be inferred from her testimony, the prosecution's statements did not deny Wilson a fair and impartial trial.

Wilson also contends that the prosecution vouched for AB's credibility by stating that she "did the good, right and brave thing, and she is worthy of your belief." This was not vouching, either. Rather, the statements that AB was "brave" and "worthy of [the jury's] belief" were reasonable inferences from the record and support the prosecution's theory that AB was afraid to report the assault for the reasons stated above.

Wilson further argues that the prosecution committed misconduct when it used RH's testimony regarding her past sexual acts with Wilson in its closing arguments to bolster AB's credibility. Specifically, the prosecutor argued that RH's testimony regarding Wilson's past sexual acts were "one of the most important facts in this trial . . . ." The prosecution also stated that AB could not have known that Wilson had a habit of pulling out his flaccid penis and rubbing it on a woman's vagina until he became erect unless it had happened to her. As noted above, however, RH's testimony was not inadmissible character evidence. Therefore, the prosecution's reliance on this evidence was not problematic.

## V. ASSISTANCE OF COUNSEL

Wilson continues to argue that his trial counsel provided ineffective assistance, warranting a new trial. To establish the right to a new trial based on the ineffective assistance of counsel, a defendant must satisfy two components: "First, the defendant must show that counsel's performance was deficient. . . . Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). To establish that counsel's performance was deficient, a defendant must show that

counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Solmonson*, 261 Mich App 657, 663; 683 NW2d 761 (2004). To establish prejudice, the defendant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceedings would have differed. *Id*. at 663-664.

Following the *Ginther* hearing, the trial court determined that counsel's performance was constitutionally deficient, but that the errors did not affect the outcome of the trial. We discern no error in the trial court's conclusion.

Wilson has demonstrated that Mendham's performance fell below an objective standard of reasonableness under prevailing professional norms. A counsel's "strategic choices made after less than complete investigation are reasonable precisely to the extent that professional judgments support the limitations on investigation." *Strickland*, 466 US at 690-691. "[R]easonably effective assistance must be based on professional decisions and informed legal choices can be made only after investigation of options." *Id*. at 680. "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v Alabama*, 571 US 263, 274; 134 S Ct 1081; 188 L Ed 2d 1 (2014).

Mendham developed his defense theory after reviewing the police report and interviewing Wilson. Mendham stated that he did not object to Cottrell's testimony regarding the rarity of achieving a gain from false allegations because he did not "have the luxury of sitting at a desk and reviewing the rules of evidence and the court rules, and I'm running through the rules of evidence in my mind, and the court rules in my mind, trying to decide whether or not this was an inappropriate response." While he had researched caselaw concerning the admissibility of delayed-reporting evidence, he had not researched caselaw addressing whether testimony regarding delayed reporting amounted to vouching for the witness. In addition, Mendham admitted that his familiarity with caselaw regarding mental health expert testimony was limited. Significantly, Mendham further admitted that he was not familiar with a number of relevant cases, including *Thorpe*.[2] It is not difficult to conclude that Mendham deficiently prepared for trial, which prevented him from making an informed choice regarding possible objections.

Mendham's deficient performance did not alter the outcome of these proceedings, however. Unlike in *Thorpe,* Cottrell did not vouch for AB's credibility, and no error occurred in the admission of his testimony. Nor did Mendham's lack of preparation affect the introduction of RH's testimony. The evidence was admissible as Mendham surmised and there was no ground to object. Mendham's evidentiary analysis was flawed, but his conclusion was correct. Absent prejudice, Wilson cannot establish entitlement to a new trial.

---

[2] Mendham's lack of familiarity with *Thorpe* is remarkable given that Cottrell was also the expert witness in that case, and his testimony was similar to the testimony he provided here.

## VI. MASKING REQUIREMENT

Wilson contends that the trial court improperly required only him to wear a mask throughout the trial, violating his rights to a fair trial and to confront the witnesses against him.

First and foremost, we note that Wilson mischaracterizes the events at trial. Everyone was required to wear masks pursuant to the court's COVID-19 protocols. When a witness took the stand to testify, the court instructed him or her to remove the mask. The judge removed his mask when seated behind the bench. The attorneys were also instructed to remove their masks when addressing the court and when standing at the podium. This process did not deny Wilson his right to a fair trial. Everyone understood why Wilson was wearing a mask and no one could have possibly held it against him.

The masking requirement also did not interfere with Wilson's right to confront the witnesses against him. Indeed, the "preference for face-to-face confrontation at trial" under the Confrontation Clause "must occasionally give way to considerations of public policy and the necessities of the case . . . ." *Maryland v Craig*, 497 US 836, 849; 110 S Ct 3157; 111 L Ed 2d 666 (1990) (quotation marks and citations omitted).

In this regard, we find instructive *Collins v Nizzi*, unpublished per curiam opinion of the Court of Appeals, issued January 20, 2022 (Docket Nos. 354510 and 354871), in which this Court adopted the reasoning in *United States v Crittenden*, unpublished order of the United States District Court for the Middle District of Georgia, issued August 21, 2020 (Docket No. 4:20-CR-7), regarding the impact of COVID-19 masking protocols on the right of criminal defendants to confront the witnesses against them. This Court found persuasive the reasoning that face masks do not prohibit a criminal defendant and the witnesses "from looking upon each other in person." *Collins*, unpub op at 8 (quotation marks and citation omitted). "There is no reason to believe that it is any less difficult to tell a lie to a person's face just because the liar's nose and mouth are covered." *Id*. (cleaned up). This Court also found persuasive the *Crittenden* Court's reasoning that

> "[t]he Confrontation Clause does not guarantee the right to see the witness's lips move or nose sniff, any more than it requires the jurors to subject the back of a witness's neck to a magnifying glass to see if the hair raised during particularly probative questioning. Just as appropriate clothing will cover other parts of witnesses' bodies and potentially cover certain muscle twitches in those areas, the jury will not be able to see the masked witness's entire facial expressions. The masks, however, will not prevent observation of other aspects of their body language." [*Id*., quoting *Crittenden*, unpub op at 9 (emphasis omitted).]

Like in *Collins*, Wilson received "a full trial, during which he was provided with the opportunity to present evidence, examine and cross-examine witnesses, and respond to the evidence presented by the defense." And as noted by *Collins*, "any perceived prejudice was shared equally by the parties." *Collins*, unpub op at 10. Specifically, all persons in the courtroom, with the exception of the judge on the bench, witnesses while testifying on the stand, and counsel when addressing the judge or at the podium, were required to wear a mask. Had Wilson opted to take the stand, he too would have been instructed to remove his mask. There simply is no ground to

believe that the jury held Wilson's mask against him or that Wilson could not adequately confront the witnesses with his mouth and nose covered to prevent viral spread.

## VI. CUMULATIVE ERROR

Finally, Wilson contends that he is entitled to a new trial based on the effect of cumulative errors committed at his trial. No prejudicial error occurred at trial to support Wilson's claim. Accordingly, Wilson cannot establish the right to a new trial. See *People v Dobek*, 274 Mich App 58, 106; 732 NW2d 546 (2007).

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Anica Letica